**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Bautista CASTILLO–FELIX,**
**Defendant-Appellant.**

**No. 75–2915.**

United States Court of Appeals,
Ninth Circuit.

July 9, 1976.

Bill H. Enriquez (argued), Tucson, Ariz., for defendant-appellant.

James E. Mueller, Asst. U. S. Atty. (argued), Tucson, Ariz., for plaintiff-appellee.

## OPINION

Before ELY and HUFSTEDLER, Circuit Judges, and SMITH,* District Judge.

RUSSELL E. SMITH, District Judge.

Defendant was indicted in Counts II and IV for counterfeiting alien registration receipt cards (Form 1–151) for Mexican citi-

* The Honorable Russell E. Smith, United States District Judge for the District of Montana, sitting by designation.

zens Martin Reynosa-Gomez (Martin) and Juan Reynosa-Gomez (Juan) in violation of 18 U.S.C. § 1426(a), and in Counts III and V for encouraging and inducing the unlawful entry into the United States of the same Mexican citizens in violation of 8 U.S.C. § 1324(a)(4).

The evidence discloses that the defendant met Martin in Nogales, Mexico. Martin delivered to the defendant three passport photographs and $80.00. At a later date defendant, as he had promised, delivered to Martin in Mexico a forged alien registration receipt card which Martin used to enter the United States. The defendant told Martin to go to the Suprema Cafe in Tucson. He did so and found employment. Defendant visited Martin at the cafe and collected the balance of the price of the false card and talked to Martin about Juan's card.

Juan, Martin's brother, met defendant in Nogales, Mexico, delivered some passport photographs, and paid defendant $150.00 [1] for a false alien registration receipt card which was to be delivered to Juan in Tucson. Defendant showed Juan a hole in the boundary fence through which Juan entered the United States. He, too, acting at defendant's advice, went to the Suprema Cafe, where he was employed. The false card was delivered to Juan in Tucson.

We believe the evidence abundantly sufficient to prove that defendant did encourage Martin and Juan to enter illegally as charged in Counts III and V of the indictment. We also believe that the evidence was more than sufficient to prove that defendant, either as principal or as an aider and abettor, caused the making of the false registration cards.

We have difficulty, however, as to Counts II and IV in determining the locus of the crimes, and as to Counts III and V, we believe, as hereinafter indicated, that the acts constituting the crime took place in Mexico. Problems in jurisdiction and venue appear.

1. Martin testified that the delivery of Juan's photographs and money took place in Tucson.

**12**

■ First, as to the counterfeiting counts, we conclude that, as to Counts II and IV, the acts constituting the crime took place either in Arizona or Mexico, but that there is no evidence from which a jury could select one place over the other.[2]

As to Counts III and V, we believe that the acts constituting the crime took place in Mexico.[3]

■ The question arises, therefore, whether there was sufficient proof that crimes cognizable under the laws of the United States had been committed. The Supreme Court in *United States v. Bowman,* 260 U.S. 94, 43 S.Ct. 39, 67 L.Ed. 149 (1922), said at 98, 43 S.Ct. at 41:

But the same rule of interpretation should not be applied to criminal statutes which are, as a class, not logically dependent on their locality for the government's jurisdiction, but are enacted because of the right of the government to defend itself against obstruction, or fraud wherever perpetrated, especially if committed by its own citizens, officers or agents. Some such offenses can only be committed within the territorial jurisdiction of the government because of the local acts required to constitute them. Others are such that to limit their *locus* to the strictly territorial jurisdiction would be greatly to curtail the scope and usefulness of the statute and leave open a large immunity for frauds as easily committed by citizens on the high seas and in foreign countries as at home. In such cases, Congress has not thought it necessary to make specific provision in the law

2. There is no direct evidence in the record which discloses where the defendant made the false cards or where, if he was not a principal, he had any dealings with the person or persons who did make the cards.

The record shows that defendant lived in Tucson but discloses nothing as to the quality of his residence there. It cannot be determined whether defendant lived in an elaborate dwelling or out of a suitcase; whether he spent almost all or very little of his time in the United States. The proof that the actual counterfeiting took place in Arizona is dependent upon the inferences which may be drawn from the facts that defendant lived in Tucson, that he collected the payment for Martin's card in Tucson, that he delivered Juan's card in Tucson, and, if the jury believed Martin as opposed to Juan, that Juan's money and photographs were delivered in Tucson. In our opinion these facts do not warrant an inference strong enough to prove beyond a reasonable doubt that the defendant made the cards in the District of Arizona.

We then face the problem of whether what was done in Arizona constitutes aiding and abetting, which would make defendant liable as a principal. 18 U.S.C. § 2. As to Martin, the card was delivered in Mexico and paid for in Arizona. If defendant was a principal, the crime was complete when the card was made, and it seems axiomatic that defendant could not aid and abet himself. If another made the card and the defendant paid him for it, then the aiding and abetting was complete when the payment was made, and the defendant, by recouping his advances from Martin, neither aided nor abetted the counterfeiter. Perhaps, if there had been a promise made prior to the counterfeiting that the defendant would sell the card on credit and then collect from the alien in the United States and remit to the counterfeiter, the act of collecting in fulfillment of the promise would be an act of aiding and abetting the crime. But the record leaves us in the dark as to who did what and where it was done.

As to Juan the record is equally dark. All we know is that there were dealings between defendant and the aliens with respect to the card in Tucson. These dealings were sufficient to sustain a conviction and fix venue under 18 U.S.C. § 1426(b), making it illegal to dispose of a counterfeited alien registration receipt card, but that crime was not charged. Again, if defendant was the counterfeiter, he could not aid and abet himself. If some other person was the counterfeiter, an arrangement between defendant and the counterfeiter, whereby defendant was to deliver the completed card, might constitute an aiding and abetting. But again, the record leaves us in the dark as to who did what and where it was done.

3. All of the encouragement to enter given to Martin and Juan was given in Mexico. It is true that a false card was delivered to Juan in Tucson, Arizona, but the promise to deliver was made in Mexico. So far as Juan's card was concerned, it was the promise to deliver it that constituted the encouragement to enter. The crimes were complete before either Juan or Martin entered the United States. The act of delivery to Juan might have been charged as a separate crime under 18 U.S.C. § 1426(b), but it was not a part of the inducement to enter.

that the *locus* shall include the high seas and foreign countries, but allows it to be inferred from the nature of the offense. In the case of *Brulay v. United States*, 383 F.2d 345 (9th Cir. 1967), *cert. denied*, 389 U.S. 986, 88 S.Ct. 469, 19 L.Ed.2d 478 (1967), this court applied the rule of *Bowman* to a conspiracy to smuggle, even though the conspiracy had been formed in Mexico and all the overt acts had taken place in Mexico. The rule announced in *Bowman* is particularly applicable here. Acts of inducing aliens to enter the United States or of counterfeiting alien registration receipt cards have no purpose unless they are intended to facilitate the unlawful entry of an alien or his continued illegal residence in the United States. The effect of such crimes committed out of the United States takes place in the United States, and, in terms of the regulation of immigration, it is unimportant where acts constituting the crime occur.

 Crimes punishable under the laws of the United States were committed, and the venue was properly in Arizona whether under 18 U.S.C. § 3238 or Fed.R.Crim.P. 18.

 Counts II and IV of the indictment charge that the offenses were committed in Tucson, and the court charged the jury that it was required to find that the crimes took place in Tucson. The jury made that finding although, in our opinion, it was not justified by the evidence. Normally a judgment will not be reversed where a proper result is reached on the basis of a wrong reason, provided that the defendant suffered no prejudice. *United States v. Catena*, 500 F.2d 1319 (3d Cir. 1974); *Egan v. Teets*, 251 F.2d 571 (9th Cir. 1957). Here we cannot say that as a result of what was done the defendant suffered no prejudice.

An attorney viewing the Government's case on Counts II and IV at the close of the evidence, and knowing that the court would instruct the jury that the crimes charged in Counts II and IV had to occur in Arizona, might very well have chosen to rest on the weakness of the Government's proof rather than to risk improving the Government's case by calling witnesses in defense. That choice was made here. Had the case been made upon the theory which we have advanced, an entirely different problem would have been presented. The strength of the Government's case as to the happenings in Mexico might very well have persuaded defendant's counsel that the defendant's sole chance for acquittal lay in the calling of witnesses, including perhaps the defendant, to rebut some parts of the Government's evidence. Perhaps nothing different would have happened, but we are not in a position to say that the defendant did not suffer prejudice.[4]

 Defendant claims that he has twice been placed in jeopardy and that his rights have otherwise been violated because the United States dismissed a former indictment charging the same crimes. The United States did charge these crimes in a previous indictment. Pending trial on the first indictment, the aliens who testified in this case returned to Mexico, and the indictment was then dismissed on motion of the United States because it then appeared that there would be no evidence available to the United States to prove the charges. When the aliens returned, defendant was charged in the indictment underlying this prosecution. The previous case had not proceeded to the trial stage when the indictment was dismissed, and jeopardy did not attach. We have no doubt that, had the Government dismissed the first indictment for the purpose of denying to defendant the use of witnesses that defendant now claims would have been available to him and had the case

---

4. This point in this form was not made in the court below because the case was tried on the theory that the acts constituting Counts II and IV had to be shown to have been committed in Arizona. Perhaps the conviction on Counts II and IV could be reversed because the jury made an erroneous finding as to where the acts were committed, but to preserve the vitality of the rule that cases will not be reversed where a right result is reached for a wrong reason, we have based our decision on the fact that here the defendant may have been misled to his prejudice.

proceeded to trial on the first indictment or had the United States itself made the witnesses unavailable, there would have been a denial of due process. *United States v. Mendez-Rodriguez*, 450 F.2d 1 (9th Cir. 1971). That does not appear from the record here.

In the event that defendant should be retried on Counts II and IV, we note, for the guidance of the district court, the following:

■ We find the contention without merit that 18 U.S.C. § 1426(a) does not embrace the counterfeiting of an alien registration receipt card. 8 U.S.C. § 1302 requires aliens to register. 8 C.F.R. § 264.1(b) makes Form 1–151 evidence of such registration. The card is a paper authorized by law relating to the registry of aliens within 18 U.S.C. § 1426(a). That section does not, as defendant contends, relate solely to naturalization and citizenship.

■ We find without merit the contention that, since 8 U.S.C. § 1306(d) is specific as to the counterfeiting of alien registration receipt cards, the prosecution should have been under it rather than under the more general provisions of 18 U.S.C. § 1426(a). It is the general rule that, where an act violates more than one statute, the Government may elect to prosecute under either unless the congressional history indicates that Congress intended to disallow the use of the more general statute. *United States v. Brown*, 482 F.2d 1359 (9th Cir. 1973). There is nothing in the legislative history to indicate that by the enactment of 8 U.S.C. § 1306(d) Congress intended to disallow the use of 18 U.S.C. § 1426(a). *Cf. Kniess v. United States*, 413 F.2d 752 (9th Cir. 1969).

Other contentions made by defendant have been examined and found to be without merit.

The judgment of convictions is affirmed as to Counts III and V and is vacated as to Counts II and IV, and the case is remanded with directions to grant defendant a new trial as to Counts II and IV.