**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Jose Patricio SANCHEZ–MURILLO,
Defendant-Appellant.**

No. 78–2584.

United States Court of Appeals,
Ninth Circuit.

Dec. 3, 1979.

Alan Saltzman, Saltzman & Horvitz, Beverly Hills, Cal., for defendant-appellant.

Bruce R. Castetter, Asst. U. S. Atty. (on the brief), Michael H. Walsh, U. S. Atty., Barton C. Sheela, III, Asst. U. S. Atty. (argued), San Diego, Cal., for plaintiff-appellee.

Before SNEED and TANG, Circuit Judges, and PFAELZER,* District Judge.

PFAELZER, District Judge:

I

FACTS AND PROCEDURAL SETTING

Defendant-Appellant Jose Patricio Sanchez-Murillo (herein "defendant") appeals from his conviction for conspiring to smuggle, induce, harbor and transport illegal aliens, and for harboring illegal aliens, all in violation of 18 U.S.C. § 371 and 8 U.S.C. § 1324. Defendant was indicted by a Federal Grand Jury for these violations on April 5, 1978. On May 4, 1978, defendant moved for dismissal of the indictment on the ground that the government had returned a "percipient witness" to Mexico without allowing his counsel the opportunity to interview the witness.

Evidence adduced at the pretrial hearing on the motion for dismissal revealed that in September of 1977, the Border Patrol received an anonymous telephone call stating that two houses belonging to one of the other defendants in the case were being used as "drop houses"[1] for illegal aliens. Border Patrol Agent Daniel McCaskill (herein "Agent McCaskill") began preliminary surveillance of the houses in September. In February 1978, Agent McCaskill intensified his investigation and the Border Patrol began conducting intensive surveillances of the houses over a period of several weeks.

On or about February 16, 1978, Agent McCaskill met Miguel Mercado-Bermudez, (herein "Bermudez"), who told Agent

---

* Honorable Mariana R. Pfaelzer, United States District Judge for the Central District of California, sitting by designation.

1. Drop houses are temporary way stations for illegally transported aliens, usually located near the border on the United States side. The aliens remain in the drop house until the Border Patrol checkpoint on Interstate 5 is closed and the aliens can be smuggled north.

McCaskill that he had been at the suspect houses on several occasions and had been solicited to work for an alien smuggling ring at that location. Agent McCaskill decided to have Bermudez infiltrate the smuggling ring and act as an informant. To this end, Bermudez was given an immigration form permitting him to enter the United States and was directed to keep Agent McCaskill informed of his activities. Specifically, he was instructed to contact Agent McCaskill immediately upon entering the United States and before he engaged in any activities with the ring.

On February 24, 1978, Agent McCaskill was advised that Bermudez had been arrested entering the United States. Agent McCaskill again told Bermudez that he was required to keep him informed of his activities, and Bermudez was returned to Mexico in order to protect his cover.

On February 26, 1978, surveillance agents saw Bermudez at the drop houses. His presence there had not been authorized by Agent McCaskill. Later that evening, Bermudez was arrested by the Border Patrol near the Salton Sea in the company of several other illegal aliens. Agent McCaskill instructed the Border Patrol to return Bermudez to Mexico. Bermudez' permit was taken from him and he was instructed to contact Agent McCaskill from San Ysidro as soon as possible after his arrival in Mexico. Thereafter, not having heard from Bermudez, Agent McCaskill sent a letter to his address in Mexico. The letter was not answered. Sometime later Agent McCaskill refused to accept a collect call from a person claiming to be Bermudez.

At the hearing on the motion to dismiss the indictment, defendant argued that by returning Bermudez to Mexico, the government deprived him of the right to subpoena Bermudez as a witness. Defendant claimed that this prejudiced his ability to present his defense, in violation of his constitutional right to due process.

The trial court denied the motion to dismiss and a jury trial was held on May 24, 1978. At the trial, Agent McCaskill testified as to the *modus operandi* of alien smuggling rings, and explained the function of drop houses. Agent McCaskill also testified regarding the surveillance of the particular houses in this case. He stated that on several occasions during his preliminary surveillance he saw a 1977 Dodge van registered to defendant, parked near the houses being investigated. Other surveillance agents testified that they observed a number of vehicles loading and unloading individuals who entered and exited the basements of the suspect houses. Bags of groceries were frequently taken into the basements and garages of the houses, and the defendant was twice observed carrying groceries into one of the garages. On one occasion, four males were seen coming out of one of the garages and running in a crouch to defendant's van. Defendant walked to the van, looked in, and drove it away. On another occasion, codefendant Irene Perez was arrested driving a car with two illegal aliens in the trunk. The car was registered to defendant and he subsequently retrieved the car from the police storage lot.

On the night of March 26, 1978, Border Patrol Agents, pursuant to a warrant, searched the two houses in question. The garages and basements of the houses showed signs of concentrated human occupancy, including accumulations of food wrappers and human excrement on the floors. Ten illegal aliens were found in the basement of one house and eight more were in the garage. Defendant and codefendant Ruth Perez, the daughter of codefendant Irene Perez, were found in bed in the upstairs portion of this house. Three of the illegal aliens found in the garage testified that they had made arrangements with an individual in Tijuana to be smuggled into the United States for $200 each. They had been led across the border on foot and then driven in a van to the address at which they were subsequently arrested.

Defendant was convicted on four counts of the indictment, one for conspiracy and three for harboring illegal aliens. He was sentenced to four years in custody on the conspiracy charge and five years in custody

on each of the other three counts. The five year sentences, which ran concurrently with each other but consecutive to the four year sentence, were suspended and defendant was placed on probation for a period of five years. Defendant is presently in custody serving his four year sentence.

## II

## ISSUES PRESENTED ON APPEAL

1. Did the trial court err in denying defendant's motion to dismiss the indictment?

2. Is the evidence sufficient to sustain the jury's verdict?

3. Did the trial court err in permitting the investigating officer to testify as an expert at the trial?

4. Did the trial court abuse its discretion by sentencing the appellant to four years in custody on the conspiracy charge?

## III

## DISCUSSION

A. Motion to Dismiss

Defendant argues that the government should not have returned Bermudez to Mexico, relying primarily on *United States v. Mendez-Rodriguez*, 450 F.2d 1 (9th Cir. 1971). The defendant in that case was arrested driving an automobile which contained six illegal aliens. The Border Patrol interviewed all of the aliens and then returned three of them to Mexico, retaining the other three to testify as witnesses at the trial. The three prosecution witnesses testified only that they were waiting by the roadside and were told to get into the car when it pulled up. The court found that the government had deprived the defendant of the opportunity to examine the other three witnesses who might have been able to support his version of the facts and that it was a violation of due process to return those witnesses to Mexico. The conviction was overturned.

The factors which led to the decision in *Mendez-Rodriguez* were summarized in *United States v. McQuillan*, 507 F.2d 30, 32–33 (9th Cir. 1974) as follows: 1) the court's disapproval of the government's policy of "keeping select alien eyewitnesses while returning others to Mexico";[2] 2) the aliens returned to Mexico "were in fact eyewitnesses to, and active participants in, the crime with which defendant was charged"; 3) the defendant "had an alibi which might have been corroborated by the missing witnesses"; and 4) although the defendant was unable to show that the testimony of the missing witnesses would have been helpful, "there was at least a strong probability that the missing witnesses could have provided material and relevant information concerning the events constituting the crime."

In *United States v. Castellanos-Machorro*, 512 F.2d 1181 (9th Cir. 1975), these principles were applied to a case where defendants were a husband and wife who managed a motel used as a drop house. The husband was convicted of one count of conspiracy and eleven counts of harboring illegal aliens, all of which related to the concealment and transportation of five named aliens. The wife was convicted only of conspiracy. Both defendants appealed on the ground that they were deprived of the opportunity to interview 88 aliens apprehended while allegedly traveling north from the motel and approximately 200 other aliens discovered in the vicinity of the motel. The court, in rejecting both appeals, relied on the principles enunciated in *Mendez-Rodriguez*, stating that the husband "[has made] no claim that any of the 88 aliens who were released had any connection with the transactions that formed the basis for counts two through eleven; their testimony could not conceivably exculpate him." *Id.* at 1183. The wife's claim was similarly rejected because, although she argued that the 88 aliens "could have offered

---

**2.** *See also United States v. Tsutagawa*, 500 F.2d 420 (9th Cir. 1974), which reversed a defendant's conviction because the government screened 39 possible witnesses, then returned all but 4 to Mexico.

testimony that would have helped her defend against [the conspiracy] charge," she was unable to articulate what that evidence could possibly be. The court concluded that "[i]t was therefore no violation of her rights for the Government to release them before she had an opportunity to interview them." *Id.* at 1184.

■ The situation in the present case is similar to that in *Castellanos-Machorro.* Here, the defendant has made no attempt to demonstrate how the testimony of Bermudez could possibly be helpful to his case. Defendant makes the bare assertion that "Bermudez was an eyewitness to some of the alleged conspiratorial criminal activity, and might have exonerated the defendant." It is not at all clear what it was that Bermudez allegedly witnessed, nor how Bermudez could conceivably have exonerated defendant. Defendant further states that the witness "was actually in the house when illegal aliens were there, which is the same house where defendant was arrested with illegal aliens, and the witness had been offered a job with this same illegal smuggling ring on a prior occasion." However, there is nothing to indicate that Bermudez had any contact with defendant, that he witnessed any of the acts performed by defendant, or was present at defendant's arrest. Defendant was not convicted with respect to any activities he performed *vis-a-vis* Bermudez. The connection between defendant and Bermudez is tenuous at best.

Furthermore, the present case does not involve a situation where the government has screened witnesses to select those who would be most favorable to its position. Rather, Bermudez was simply an uncooperative informant whom the government decided not to use. Since the concerns which lead to the decision in *Mendez-Rodriguez* are not present in this case, we conclude that the motion to dismiss the indictment was properly denied by the trial court.

## B. Sufficiency of the Evidence

Defendant next claims that the evidence was not sufficient to convict him of the conspiracy charges. Specifically, defendant contends that there is no direct evidence that he knew that any of the individuals in the house were illegal aliens or that he was otherwise aware of any criminal activity.

■ It is not necessary to prove directly that a defendant knows of the existence of criminal acts in order to convict him of conspiracy. Such knowledge can be inferred from the defendant's actions and other circumstantial evidence in the case as a whole, *United States v. Young,* 573 F.2d 1137 (9th Cir. 1978), and a conspiracy conviction will be sustained even if the defendant's connection to the conspiracy is slight. *United States v. Dunn,* 564 F.2d 348, 357 (9th Cir. 1977).

■ In the present case, the defendant was observed bringing food into the garage and driving persons away from the drop house in his van. These acts could reasonably be construed by a jury as acts in furtherance of the conspiracy. Furthermore, the jury could justly conclude that defendant had knowledge that illegal aliens were being transported, particularly in light of codefendant Irene Perez' arrest for transporting illegal aliens in defendant's car.

## C. Expert Testimony

■ Defendant argues that it was error for the trial court to permit Agent McCaskill, who investigated and supervised the case, to testify as an expert witness on the *modus operandi* of alien smuggling rings. The basis for the objection is that the investigating officer may be biased in favor of obtaining a conviction and this might influence his expert testimony. Defendant also suggests that the jury may be unduly influenced by the factual testimony of the investigating officer if he has been established as an expert. Since this objection was not raised by defendant at the trial, he cannot raise it on appeal unless he can show that "the probability is high that the error materially affected [the] verdict." *United States v. Segna,* 555 F.2d 226, 231 (9th Cir. 1977). Defendant's speculation that there might have been some prejudice

fails to meet the standard of material error necessary for consideration of his untimely objection.

## D. Severity of Sentence

Defendant's final argument on appeal is that the sentence he received on the conspiracy count, four years in custody, is excessive and constitutes cruel and unusual punishment. He points out that he has no prior record, and that the trial court made no specific findings justifying the sentence.

As stated by this court in *United States v. Moreno*, 569 F.2d 1049, 1053 (9th Cir. 1978), "[t]he matter of sentencing is within the discretion of the trial court and is not reviewable by an appellate court so long as the sentence is within the bounds prescribed by statute." The only exception to this rule is where the defendant can establish that information presented to the court prior to sentencing should not have been considered. *United States v. Weston*, 448 F.2d 626 (9th Cir. 1971), *cert. denied*, 404 U.S. 1061, 92 S.Ct. 748, 30 L.Ed.2d 749 (1972). Since defendant has made no such showing, there is no basis for his claim that the sentence imposed was an abuse of the court's discretion.

## IV

## CONCLUSION

The convictions from which defendant appeals are AFFIRMED.