UNITED STATES of America, Appellee,

v.

Edward KAVAZANJIAN, Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

Mourad AVEDISSIAN, Defendant, Appellant.

Nos. 79–1243, 79–1244.

United States Court of Appeals, First Circuit.

Argued March 11, 1980.

Decided June 27, 1980.

**732**

Daniel Riesel, New York City, with whom Lawrence R. Sandak, and Winer, Neuburger & Sive, New York City, were on brief, for appellant, Edward Kavazanjian.

Marshall F. Newman, Boston, Mass., by appointment of the court, with whom Newman & Newman, P. C., Boston, Mass., was on brief, for appellant, Mourad Avedissian.

Alan D. Rose, Asst. U. S. Atty., Boston, Mass., with whom Edward F. Harrington, U. S. Atty., Boston, Mass., was on brief, for appellee.

Before COFFIN, Chief Judge, BOWNES, Circuit Judge, and WYZANSKI, Senior District Judge.*

BOWNES, Circuit Judge.

Following a jury trial in the District Court for the District of Massachusetts, appellants Edward Kavazanjian and Mourad Avedissian were convicted under 18 U.S.C. § 371 of conspiring both to defraud, and to commit offenses against, the United States and under 8 U.S.C. § 1324 of encouraging or inducing the entry into this country of aliens not lawfully entitled to enter or reside here. We conclude that an error of law tainted the indictment and therefore reverse the convictions.

I.

The case revolves around the efforts of the appellants to assist aliens—mostly Armenian Christians of Iraqui citizenship who had gathered in Athens, Greece to avoid persecution in their country—in coming to the United States and seeking political asylum. The evidence showed that, in the latter part of 1977, several dozen aliens arrived at United States airports in the status of "transits without visa" and then, in most cases, applied for asylum and were "paroled" into this country. A brief description of these immigration law devices must precede any further explication of the facts.

The transit without visa (TWOV) device is designed to facilitate international travel. It permits aliens travelling from one foreign country to another, which route entails a stopover in the United States, to proceed "in immediate and continuous transit" through this country without a passport or visa. 8 U.S.C. § 1182(d)(4)(C) (1970). An individual desiring to use the transit without visa privilege must establish, *inter alia*, that (1) he is admissible under the immigration laws, (2) he has confirmed means of transportation to at least the next country, and (3) he will accomplish his departure within eight hours after his arrival or on the next available transport. 8 C.F.R. § 214.2(c) (1980); *accord, id.* § 212.1(e)(1); 22 *id.* § 41.30. A TWOV is barred from applying for extension of temporary stay or for adjustment of his status to that of permanent resident, 8 U.S.C. § 1255(c)(3) (Supp. VI 1976); 8 C.F.R. § 214.2(c)(1) (1980), and the responsibility for his custody lies with the transportation line which brought him to the United States unless the Immigration and Naturalization Service (INS) intervenes. *Id.*

The parole device constitutes one of two alternative mechanisms for dealing with foreign nationals who seek asylum in the United States because of persecution in their native countries. The second device, known as conditional entry, is the more rigid; it permits the admittance each year of up to 10,200 aliens who, *inter alia*, have fled from, and are unable or unwilling to return to, a communist-dominated or Middle East country because of actual or threatened persecution on the basis of race, religion, or political opinion. 8 U.S.C. § 1153(a)(7) (1970). Two years after their

---

* Of the District of Massachusetts, sitting by designation.

conditional entry, these refugees are able to apply for permanent resident status. *Id.* The parole mechanism, by contrast, is not subject to any numerical limitation and is not contingent upon an alien's being otherwise admissible. 8 C.F.R. § 212.5 (1980). An additional distinction is that the availability of parole is not restricted to political refugees; the Attorney General is authorized to parole aliens into the United States "temporarily under such conditions as he may prescribe for emergent reasons or for reasons deemed strictly in the public interest." 8 U.S.C. § 1182(d)(5) (1970). As a result of this inherent flexibility, large numbers of aliens—both refugees and others—have been paroled into this country.[1] Unless a parolee gains permanent resident status in the interim pursuant to 8 U.S.C. § 1255 (1970), he is restored to his former status upon fulfillment of the conditions of parole or whenever parole is deemed no longer warranted. *Id.* § 1182(d)(5).

Count one of the indictment charged the defendants with three separate acts of conspiracy. First, it alleged that, by arranging for aliens to come to this country ostensibly as TWOV's and, upon their arrival, to claim asylum and obtain parole, the defendants conspired to defraud the United States by circumventing the TWOV and conditional entry programs, all in violation of 18 U.S.C. § 371. Second, the defendants were charged with conspiring to violate 8 U.S.C. § 1324 by encouraging or inducing the entry into the United States of aliens not lawfully entitled to enter or reside here. Finally, count one alleged that they conspired to violate 18 U.S.C. § 1001 and 18 U.S.C. § 2 by concealing material facts and making and causing others to make false statements in material matters within the juris-

diction of the INS. The second and third actions were said to constitute conspiracies to commit offenses against the United States, again in violation of 18 U.S.C. § 371. Counts two and three were substantive counts, alleging that the defendants violated 8 U.S.C. § 1324 by assisting two named aliens in seeking asylum and gaining parole after their arrival as TWOV's at Boston's Logan Airport.[2]

## II.

From the evidence presented at trial, the jury could have found as follows: The defendant Kavazanjian, an American citizen of Armenian descent, served for fourteen years until his retirement in 1976 as a criminal investigator in the New York district of the INS. Thereafter, he worked in New York as a travel agent and as a private consultant on immigration matters. Throughout this period, Kavazanjian volunteered substantial amounts of time to various Armenian church and philanthropic organizations in their efforts to assist Armenians both in this country and abroad. The defendant Avedissian is a young Armenian Christian who came to the United States in 1976 and acquired permanent resident status. In August of 1977, Kavazanjian employed Avedissian as an "intern" because of the latter's fluency in Arabic.

The defendants' activities were thereafter devoted in large part toward attempting to alleviate the plight of the Armenian community in Athens. Many of the residents there were Iraqui citizens, who had fled their country following the ascendency to power of the Baathist party and the ensuing persecution of Armenian Christians.[3] Their situation in Athens was unstable, for

1. Aside from assisting political refugees, the parole device has been invoked for a multitude of reasons, ranging from an alien's receiving medical treatment to his serving as a witness. *See generally*, C. Gordon & H. Rosenfield, *Immigration Law and Procedure* § 2.54 (rev. ed. 1979). Parole frequently has been used as well in lieu of detention when a determination of an arriving alien's admissibility has been delayed. *See, e. g., Leng May Ma v. Barber*, 357 U.S. 185, 190, 78 S.Ct. 1072, 2 L.Ed.2d 1246 (1958).

2. The fourth count was directed only at Sanharib Jallow, who later pleaded guilty and testified for the government at trial. Count five, which charged Kavazanjian with making a false statement to the INS in violation of 18 U.S.C. § 1001, was withdrawn during trial.

3. As described at trial, such persecution was characterized by imprisonment and torture as well as a general curtailment of civil liberties.

jobs were scarce and many of the arrivals were of uncertain immigration status and feared being forcibly returned to Iraq. Obtaining asylum in the United States was thus a widely-shared goal. However, only thirty conditional entry visas per month were available to be assigned by the consular office in Athens, resulting in substantial delays for most applicants.

As a solution to this problem, the defendants realized that, if these aliens could somehow reach this country and assert their status as refugees, they would be allowed to remain here. Consequently, they were instrumental in implementing a scheme whereby aliens would board airplanes in Athens, ostensibly as transits through the United States to third countries, and then claim asylum upon arrival at American airports. The TWOV status of these aliens avoided the need for United States visas. Between September and November of 1977, dozens of aliens were successful in reaching the United States by these means—so much so that, on December 5, 1977, the TWOV privilege was revoked with respect to all Iraqui citizens. 42 Fed.Reg. 61449, 61451 (1977).

Sanharib Jallow, a co-defendant in this case who later pleaded guilty and testified for the government at trial, recruited many of the participants in this scheme, often with the promise that they would be met by a lawyer upon arrival in this country.[4] In return for a several hundred dollar fee plus costs, he procured for each alien a ticket and visa, and an appropriately stamped passport, for a country the route to which involved a stopover in New York or Boston.[5] Typically chosen as destinations were Mexico, Panama, and the Bahamas.[6] None of the aliens had any intention of actually transiting through the United States and proceeding to these locations. Jallow also frequently provided the travellers with what he termed "gifts" to be given to the defendants—an envelope containing from $200 to $1200 for Kavazanjian, and a suitcase containing new clothes and occasionally a smaller sum of money for Avedissian. On some occasions, Jallow informed the defendants of the flight number and arrival time; on others, the defendants specified this information beforehand.

Other aliens became involved in this arrangement by contacting the defendants directly. Kavazanjian was well known throughout the Armenian community in Athens and his telephone number was readily available. Some aliens called with general requests for assistance, and were instructed to arrange a flight through a designated American airport. Others, already familiar with the TWOV procedure, phoned specifically to ask for assistance upon their arrival. In some instances, contact with the defendants was initiated by an alien's friends or relatives in the United States. As a rule, the travel plans were finalized only after agreement as to the defendants' fee had been reached.[7]

The circumstances surrounding the arrival of these groups of aliens in New York or Boston were varied. One or both of the defendants typically met the aliens as they deplaned, often making contact by calling out their names. In some cases, they then proceeded together to the immigration office, where the defendants formally applied for political asylum on the aliens' behalf. Upon completion of a short application form (Form I–94), these aliens were paroled

---

**4.** Neither of the defendants is a lawyer.

**5.** There was evidence that the defendants had previously identified to Jallow certain individuals in Athens who could provide these papers as needed, and a suggestion that the passports were fraudulently prepared.

**6.** One alien testified that his travel documents were initially prepared for Mexico but later changed for Panama; he was informed by Jallow that the Mexico route was no longer feasi-

ble because immigration officials in New York "knew about it." Jallow also testified that, at one time, Kavazanjian instructed him to channel the aliens through Boston because the New York route had "too many problems."

**7.** When one prospective client balked at the price, Avedissian offered for a reduced fee *merely to get the alien out of the airport* without obtaining any immigration or working papers.

into this country temporarily—typically for several weeks—with instructions to visit an INS office on a specified date to complete the application process.[8] Once outside the airport, the defendants collected the sum of money agreed upon—usually between $400 and $800 per person—or, from those travellers sent by Jallow, the envelopes and suitcase provided by him. The aliens were then generally put on flights for Chicago or California where friends or relatives resided.

The defendants treated other arriving aliens to a somewhat more harried reception—by spiriting them out of the airport without contacting INS officials at all. On one occasion, Kavazanjian met the arrivals dressed in a maintenance uniform and shepherded them outside in a manner described as "kind of running." When confronted by a guard, he was reported to have flashed some type of badge. At another time, an airline employee escorted several aliens, in the company of the defendants, to another terminal to embark on the next leg of their ostensible journey; when the escort temporarily absented himself, the defendants ushered the aliens outside. A third group of aliens, also in the custody of an airport guard en route to another terminal, was freed when Avedissian paid $450 to the guard in a men's restroom. In each of these instances, the defendants collected their fees from the travellers once safely outside the airport.

The defendants' subsequent involvement with the aliens, who still faced the task of perfecting or initiating their claims for asylum, took one of three courses. In some cases, either or both of the defendants visited the alien and assisted in the preparation of Form I–589, typically by posing to him the same questions contained in the application and writing down his responses.[9] They then accompanied the alien to the INS office to provide any necessary assistance during the formal application and interview process. On other occasions, the defendants' involvement was limited to helping in the preparation of Form I–589. Sometimes, the defendants drafted appropriate responses after questioning the aliens. However, there was evidence that the defendants mailed to several aliens already

8. Requests for asylum are submitted on Form I–589. 8 C.F.R. § 108.1 (1980). The district director in charge of a port of entry can request execution of this form immediately following an asylum applicant's arrival and is empowered to grant or deny parole if the request is clearly meritorious or clearly lacking in substance. *Id.* § 108.2; *id.* § 212.5(a); *INS Operations Instructions* § 108.1 (1974). More often, however, formal inspection of an applicant for asylum is deferred; the alien is temporarily paroled into this country with instructions to appear at an INS office with a completed I–589 on a specified date. This was the procedure followed in the present case.

There were several suggestions at trial that the methods employed by the defendants to secure temporary parole for these aliens were of questionable propriety. Kavazanjian was quoted on one occasion as boasting that he had "a group posed in the Immigration Office." Avedissian in turn reportedly cautioned Jallow not to arrange for flights on a certain date because "our man is not on duty." In addition, there was evidence that Kavazanjian directed a group of aliens to a specific window at the immigration counter which was occupied, even though others at the time stood vacant. Whatever improprieties may have occurred, however, were not a central part of the defendants' scheme. For example, before rendering assist-

ance to a group of aliens landing in Boston, the defendants, accompanied by an attorney, consulted with the INS district director to inform him of their intentions and to inquire about local procedures. Moreover, the evidence did not show, nor has the government alleged, that the asylum claims of any of these aliens were entirely lacking in merit; indeed, the fact that none of the aliens has been returned to Iraq would suggest otherwise. In these circumstances, the governing regulations make parole almost automatic: "If the district director is satisfied as to the validity of the alien's contention that he would be subject to persecution if he returns to his home country, the alien *shall* be paroled. . . ." *INS Operations Instructions* § 108.1(c) (1974) (emphasis added).

9. Form I–589 calls for specific information from each applicant for asylum about his personal history and the conditions in his native country. In particular, it inquires, *inter alia*, whether a return to his country would subject him to persecution because of race, religion, nationality, political opinion, or membership in a particular social group; whether he has ever been detained, interrogated, or imprisoned for any of these reasons; and whether he can provide any documentation or evidence in support of his request.

completed applications without ever discussing the contents with them; some of the responses on these forms were identical,[10] and some of the information provided was erroneous.[11] Finally, a third group of aliens was denied any further assistance from the defendants, despite earlier promises to the contrary and despite repeated requests for help.

There was also evidence that the defendants later engaged in efforts to conceal or downplay their involvement in this scheme. Upon learning of one alien's being summoned for questioning by the INS, Kavazanjian attempted to dissuade him from attending, and Avedissian instructed him not to divulge the amount of money collected as their fee. More importantly, both defendants gave sworn statements to INS investigators which conflicted with the evidence at trial in several respects, particularly concerning their relationship with Jallow, the manner of contacting the aliens and the amounts of money received.

Apparently, no final decision has yet been made on any of the aliens' requests for asylum. None of the aliens has been returned to Greece or Iraq.

### III.

■■■ The centerpiece of the indictment is 8 U.S.C. § 1324(a)(4) (1970), which the defendants are alleged both to have conspired to violate (count one) and to have violated as a substantive matter (counts two and three). This provision prohibits any person from "willfully or knowingly encourag[ing] or induc[ing], or attempt[ing] to encourage or induce, either directly or indirectly, the entry into the United States

of any alien . . . not duly admitted by an immigration officer or not lawfully entitled to enter or reside within the United States . . . ." As is evident from this language, and as is underscored by the fact that the first paragraph of section 1324(a) punishes anyone who "brings into or lands in the United States" an illegal alien, *id.* § 1324(a)(1), an actual or contemplated "entry" is a prerequisite to any conviction under section 1324(a)(4).[12] The term "entry" is defined broadly in 8 U.S.C. § 1101(a)(13) (1970) as "any coming of an alien into the United States, from a foreign port or place or from an outlying possession . . . ." However, the defendants point to the judicial gloss placed on this term of art and argue that the aliens, by arriving as TWOV's and obtaining parole, never effected an "entry" within the meaning of the statute. We think this argument has substantial merit.

Most courts that have construed this term have concluded that "entry" is not accomplished until physical presence of an alien in this country is accompanied by freedom from official restraint. *E. g. United States v. Oscar,* 496 F.2d 492, 493–94 (9th Cir. 1974); *Vitale v. INS,* 463 F.2d 579, 581–82 (7th Cir. 1972); *United States v. Vasilatos,* 209 F.2d 195, 197 (3d Cir. 1954); *Klapholz v. Esperdy,* 201 F.Supp. 294, 297 (S.D.N.Y. 1961), aff'd, 302 F.2d 928 (2d Cir.), cert. denied, 371 U.S. 891, 83 S.Ct. 183, 9 L.Ed.2d 124 (1962). The *Oscar* case is illustrative. The defendant there was convicted under 8 U.S.C. § 1325 (1970) for, *inter alia,* assisting two aliens in "obtain[ing] entry to the United States by a willfully false or misleading representation . . . ." The evidence showed that he had driven the aliens to a

---

**10.** For example, the applications of three separate aliens each reply to an inquiry about what would happen if they returned to their native country with the comment: "I would be arrested immediately upon my arrival in Iraq . . . [b]ecause I have expressed my opinions and I am against communism."

**11.** One alien at trial, for example, denied the validity of statements, contained in an application which he received from the defendants and later submitted to the INS, that he had been "tortured, interrogated and detained" in Iraq.

**12.** Whether a defendant actually took part in an entry is irrelevant under this provision; the offense is committed when the encouragement or inducement to enter is given, even if no entry is ultimately made. *E. g., United States v. Castillo-Felix,* 539 F.2d 9, 12 n.3 (9th Cir. 1976); *United States v. Narvaez-Granillo,* 119 F.Supp. 556, 560 (S.D.Cal.1954). However, the encouragement must of course relate to conduct that is capable of constituting an entry, if pursued to a conclusion.

port of entry and instructed them to hide their passports from customs officials and claim to be American citizens. The aliens were immediately directed by the INS examiner to a secondary inspection area where their alien status was disclosed. The court reversed the conviction, concluding that no entry had been accomplished since the aliens were never free from the official restraint of the customs officers. 496 F.2d at 493–94.

Under this construction,[13] we reject the government's contention that the aliens entered this country when they stepped off the plane as TWOV's. The government argues that the INS regulations contemplate the admission of TWOV's for a short period of time, and refers us to 8 C.F.R. § 214.2(c)(1) (1980), which speaks of an "applicant for admission under the transit without visa privilege" and requires that he be "admissible under the immigration laws." However, that regulation goes on to state:

> [U]ntil his departure from the United States responsibility for his *continuous actual custody* will lie with the transportation line which brought him to the United States unless at the direction of the district director he is in the custody of this Service or other custody approved by the Commissioner.

*Id.* (emphasis added). However the INS may characterize his status, it certainly cannot be said that a TWOV is free from official restraint while awaiting his departure. This fact formed the basis for the court's conclusion in *United States v. Esperdy*, 210 F.Supp. 786, 790 (S.D.N.Y.1962), that "[w]hile at the airport and in the custody of the airline or the Immigration Service, [the TWOV] . . . had not effected an entry." *See also Vitale, supra*, 463 F.2d at 582 (placing alien "in the custody" of airline precluded entry).

It is also apparent, as the government appears to concede, that no entry occurred when the aliens were paroled pending disposition of their asylum requests. As one court described it, "[C]ases are legion to the effect that parole does not effect entry . . . ." *Siu Fung Luk v. Rosenberg*, 409 F.2d 555, 558 (9th Cir.), *cert. denied*, 396 U.S. 801, 89 S.Ct. 2151, 24 L.Ed.2d 58 (1969). *See, e. g., Vitale, supra*, 463 F.2d at 582; *United States v. Esperdy*, 386 F.2d 232, 235 (2d Cir. 1967), *cert. denied*, 392 U.S. 935, 88 S.Ct. 2301, 20 L.Ed.2d 1393 (1968); *Wong Hing Fun v. Esperdy*, 335 F.2d 656, 657 (2d Cir. 1964), *cert. denied*, 379 U.S. 970, 85 S.Ct. 667, 13 L.Ed.2d 562 (1965). In part, this result reflects the continued official restraint under which parolees operate. In addition, as the Supreme Court has explained, "The parole of aliens seeking admission is simply a device through which needless confinement is avoided while administrative proceedings are conducted. It was never intended to affect an alien's status . . . ." *Leng May Ma v. Barber*, 357 U.S. 185, 190, 78 S.Ct. 1072, 1075, 2 L.Ed.2d 1246 (1958) (construing 8 U.S.C. § 1253(h), which pertains to aliens "within the United States"). The statutory provision authorizing the grant of parole specifically embraces this principle, stating that "such parole of such alien shall not be regarded as an admission of the alien. . . ." 8 U.S.C. § 1182(d)(5) (1970).

We note that the government advanced the additional view below that the aliens would at least effect an entry into this country when (and if) their asylum claims are eventually allowed. Because it was neither presented on appeal nor incorporated into the jury instructions, we pause only long enough to note several difficulties with this argument. First, it is not at all clear whether the aliens ultimately will succeed in gaining asylum. We question whether section 1324(a)(4), notwithstanding the ap-

---

**13.** None of these cases interpreted the term "entry" in the specific context of 8 U.S.C. § 1324(a)(4); indeed, many of them were civil proceedings involving an alien's claim to a deportation, as opposed to an exclusion, hearing. However, like the *Oscar* court, we deem it "unlikely that Congress would define a term in § 1101 for use throughout Chapter 12 if it intended the term to have different meanings in different sections of the chapter." 496 F.2d at 494.

parent breadth of its sanction against one who "attempts to encourage or induce . . indirectly" an entry, was intended to encompass so speculative an eventuality. Second, a successful claimant for political asylum may remain in parole status indefinitely. The INS Operations Instructions, for example, prescribe that an alien who presents a meritorious claim for asylum at a seaport or airport "shall be paroled or re-paroled in increments of a year with permission to work" and shall be "reviewed annually." *INS Operations Instructions* § 108.1(c) (1974). The government apparently contemplated an eventual attempt by the aliens to adjust their status "to that of an alien lawfully admitted for permanent residence" under 8 U.S.C. § 1255(a) (Supp. VI 1976).[14] However, such adjustment of status is specifically prohibited for "any alien admitted in transit without visa. . . ." *Id.* § 1255(c); *accord, id.* § 1228(d); 8 C.F.R. § 214.2(c) (1980). *See, e. g., Fook Hong Mak v. INS*, 435 F.2d 728 (2d Cir. 1970). We raise, without deciding, the question whether the aliens' intervening status as parolees would suffice to exempt them from this prohibition.

The indictment also fares poorly under the second element of section 1324(a)(4)— that the aliens were "not duly admitted by an immigration officer or not lawfully entitled to enter or reside within the United States." In the government's view, because the aliens had no intention of proceeding in immediate and continuous transit through the United States, they were inadmissible under 8 U.S.C. § 1182(a)(19) (1970), which renders excludable any alien who, *inter alia*, "seeks to enter the United States, by fraud, or by willfully misrepresenting a material fact." As a result, the government argues that they are not "lawfully entitled to enter or reside" here.

We agree that the aliens, by arriving as TWOV's with no intention of effecting an orderly and expeditious departure, were guilty of fraud or misrepresentation. As noted above, an alien desiring to avail himself of the TWOV privilege "must establish . . . that he will continue his journey . . . within 8 hours after his arrival. . . ." 8 C.F.R. § 214.2(c)(1) (1980). In addition, any nonimmigrant applying for admission must "agree to abide by all the terms and conditions of his admission . . . [and] to depart the United States at the expiration of his authorized period of admission. . . ." *Id.* § 214.-1(a).[15] Under these circumstances, the actions of an alien who adopts TWOV status solely for the purpose of reaching this country's border, without any intention of pursuing his journey,[16] constitute a circumvention of the TWOV program and a fraud on the United States.[17] But even if this ren-

14. Section 1255(a) provides that, if three specified conditions are met, "[t]he status of an alien who was inspected and admitted *or paroled* into the United States may be adjusted by the Attorney General, in his discretion and under such regulations as he may prescribe, to that of an alien lawfully admitted for permanent residence . . . ." (emphasis added).

15. In the case of a TWOV, it is unclear to whom these representations are made; there was expert testimony at trial, for example, that a TWOV generally makes no statements upon arrival to INS officials. Even if this were so, however, we think an alien's assumption of TWOV status by itself constitutes an implicit representation that he intends merely to transit through the United States before again departing. *See Reyes v. Neely*, 228 F.2d 609, 611 (5th Cir. 1956), ("A misrepresentation may be made as effectively by conduct as by words"); *United States v. Mount Fuji Japanese Steak House, Inc.*, 435 F.Supp. 1194, 1199 n.3 (E.D.N.Y.1977)

(exhibition of tourist visa "might well constitute a fraudulent act as much as an avowed statement" that purpose of entry was to visit).

16. The aliens' avowed lack of intention to continue on to their ostensible destinations distinguishes the present case from *Bong Youn Choy v. Barber*, 279 F.2d 642 (9th Cir. 1960), and *Brownell v. Carija*, 254 F.2d 78 (D.C.Cir.1957). In each of those cases, the court characterized as non-fraudulent the conduct of an alien who visited the United States in good faith for bona fide reasons, but with the further intention to remain here permanently if permitted to do so lawfully.

17. For this reason, the defendants were properly charged with conspiracy to defraud the United States. *See, e. g., Hammerschmidt v. United States*, 265 U.S. 182, 188, 44 S.Ct. 511, 512, 68 L.Ed. 968 (1924): "To conspire to defraud the United States means primarily to cheat the

dered their arrival illegal,[18] they were nonetheless lawfully entitled both to seek asylum and to reside in this country if successful in obtaining parole. The district director of a port of entry is specifically authorized to parole inadmissible aliens into the United States. 8 C.F.R. § 212.5(a) (1980); *see, e. g., Fleurinor v. INS*, 585 F.2d 129, 134 (5th Cir. 1978); *Pierre v. United States*, 547 F.2d 1281, 1284–85 (5th Cir.), *vacated and remanded to consider question of mootness*, 434 U.S. 962, 98 S.Ct. 498, 54 L.Ed.2d 447 (1977). And once having obtained the status of parolee, an alien is obviously entitled to "reside" here, at least until "the purposes of such parole . . . have been served" and the alien is "returned to the custody from which he was paroled." 8 U.S.C. § 1182(d)(5) (1970).

■■ The foregoing is not meant to suggest that no violation of section 1324(a)(4) was established from the evidence presented at trial. Those aliens who fled from the airport without applying for asylum and gaining parole clearly effected an entry into this country.[19] *See, e. g., United States v. Esperdy, supra*, 210 F.Supp. at 790. And having accomplished such entry by fraudulent means, they were entitled under section 1182(a)(19) neither to enter nor (at least until such time as parole was granted) to reside in this country. *See, e. g., United States v. Bunker*, 532 F.2d 1262 (9th Cir. 1976). However, counts two and three of the indictment both relate to aliens who were formally paroled after requesting asylum. In light of the discussion above, these counts fail to state a crime under section 1324(a)(4) and the convictions under them must be reversed.

■ With respect to the allegation of conspiracy to violate this provision, contained in count one, the indictment and the judge's charge were ambiguous. Although the court did instruct that "parole does not effect entry," it did not charge the jury that it could convict of a conspiracy to violate § 1324(a)(4) only if it found a scheme to induce aliens to come to the United States as TWOV's and then to escape from the control of immigration authorities. Indeed, other portions of the charge conveyed the erroneous impression that a conviction was possible, not only with respect to those aliens who fled the airport, but also as to those who immediately applied for asylum. At no point did the court adequately distinguish between these two groups of aliens, and it is apparent, based upon the verdicts returned under counts two and three, that the jury failed to grasp this distinction. Therefore, this portion of the indictment and charge was similarly improper. Of course, count one also contained allegations of conspiracy to defraud the United States under 18 U.S.C. § 371 and conspiracy to commit the offense of concealing material facts from, and making false statements to, the INS under 18 U.S.C. §§ 1001, 2. However, even if the jury's verdict were supportable on either or both of these grounds, it is impossible to conclude that the conspiracy conviction was not based on the § 1324(a)(4) charge. Faced with such an "ambiguous" verdict, we are compelled to reverse the conviction under count one as well and remand for a new trial.[20] *See, e. g., Yates v. United*

Government out of property or money, but it also means to interfere with or obstruct one of its lawful governmental functions by deceit, craft or trickery, or at least by means that are dishonest."

18. As discussed above, those aliens who sought political asylum and gained parole were not "seek[ing] to enter the United States" and thus are not within the literal purview of § 1182(a)(19).

19. The fact that these aliens subsequently applied for political asylum at a regional INS office does not counsel otherwise, for even a temporary evasion of the inspection process suffices to produce an entry. *See, e. g., Cheng v. INS*, 534 F.2d 1018, 1019 (2d Cir. 1976); *United States v. Martin-Plascencia*, 532 F.2d 1316, 1317–18 (9th Cir.), *cert. denied*, 429 U.S. 894, 97 S.Ct. 255, 50 L.Ed.2d 177 (1976).

20. A retrial under these circumstances would not violate the double jeopardy clause. *See, e. g., Burks v. United States*, 437 U.S. 1, 14–16, 98 S.Ct. 2141, 2148–2149, 57 L.Ed.2d 1 (1978); *United States v. Tateo*, 377 U.S. 463, 465, 84 S.Ct. 1587, 1588, 12 L.Ed.2d 448 (1964); *United States v. Ball*, 163 U.S. 662, 671–72, 16 S.Ct. 1192, 1195, 41 L.Ed. 300 (1896).

*States,* 354 U.S. 298, 311–12, 77 S.Ct. 1064, 1072–73, 1 L.Ed.2d 1356 (1957); *United States v. Moynagh,* 566 F.2d 799, 804 (1st Cir. 1977), *cert. denied,* 435 U.S. 917, 98 S.Ct. 1475, 55 L.Ed.2d 510 (1978); *United States v. Natelli,* 527 F.2d 311, 325 (2d Cir. 1975), *cert. denied,* 425 U.S. 934, 96 S.Ct. 1663, 48 L.Ed.2d 175 (1976).

This disposition obviates the need to consider the additional contentions advanced by the defendants.

*Reversed and remanded.*