UNITED STATES of America,
Plaintiff–Appellee,

v.

Domingo MARTINEZ–MORALES,
Defendant–Appellant.

No. 79–1822.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted July 1, 1980.

Decided Nov. 10, 1980.

Warren R. Williamson, San Diego, Cal., argued, for defendant–appellant.

Roger W. Haines, Jr., Asst. U.S. Atty., argued, Michael H. Walsh, U.S. Atty., Eve D. Bermingham, Asst. U.S. Atty., on the brief, San Diego, Cal., for plaintiff-appellee.

Before SKOPIL and FERGUSON, Circuit Judges, and LYDICK,* District Judge.

SKOPIL, Circuit Judge.

## INTRODUCTION

Martinez–Morales was convicted of encouraging and inducing the entry into the United States of an illegal alien in violation of 8 U.S.C. § 1324(a)(4), aiding and abetting the entry into the United States of an illegal alien in violation of 18 U.S.C. § 2 and 8 U.S.C. § 1324(a)(1), and making a false representation of United States citizenship in violation of 18 U.S.C. § 911. He contends his fifth and sixth amendment rights were violated because the government returned his co–defendant to Mexico before he could interview him. He does not appeal his conviction for violation of 18 U.S.C. § 911.

The missing witness had no connection with the transaction underlying one conviction. The government had no way of knowing the witness was connected with the acts underlying the second conviction. We affirm.

## FACTS

On August 22, 1979 Domingo Martinez–Morales presented himself for inspection at the port of entry at Calexico, California. He was driving a car with California license plate number 978 ALS. He claimed to be a U.S. citizen and was referred to secondary inspection for investigation of this claim.

At the time of his inspection Martinez–Morales had several papers including a list of names and amounts of money, a passport with a visa indicating recent travel to El Salvador, a birth certificate in the name of Asencion Martinez–Hernandez, and ownership papers on his car.

Immigration and Naturalization Service (I&NS) records showed that the birth certificate had been used before, at a different port of entry, by someone who did not fit Martinez–Morales' description. Martinez–Morales was fingerprinted. The prints did not match those of the person who had previously used the birth certificate.

Investigator Gilliam talked with Martinez–Morales about alien smuggling and his travels to El Salvador. Martinez–Morales was denied entry. The papers in his possession were retained by the I&NS pending further investigation of his claim to U.S. citizenship.

On the night of August 24, 1979 (two days after Martinez–Morales' attempted entry) Border Patrol Agent Lupin was investigating possible alien activity near Niland Marina, California. He noticed a car with license plate 978 ALS parked near a store. Martinez–Morales was asleep inside the car. He told Lupin he was Asencion Hernandez, a U.S. citizen. Lupin recognized Martinez–Morales from an earlier encounter in which he had displayed a birth certificate. Lupin allowed him to leave.

Later that same evening Lupin found four aliens in the desert area nearby. He took the four to a border patrol station. At first all four claimed to be Mexican. They later admitted that only one, Moreno–Sandoval, was Mexican. The others were El Salvadorians whom Moreno–Sandoval had guided. Moreno–Sandoval was voluntarily returned to Mexico. The three El Salvadorians were held for return to their country. Later that night border patrol agents arrested other illegal aliens from El Salvador.

On August 25, 1979 Gilliam arrived at work and started synthesizing the information. He learned of the arrest of the El Salvadorians and remembered the list taken from Martinez–Morales three days before. The names matched. Gilliam learned Lupin

* The Honorable Lawrence T. Lydick, United States District Judge for the Central District of California, sitting by designation.

had seen Martinez–Morales in the area where the aliens were found.

The aliens still in this country were interviewed. One of them, Villatoro–Sarabia, told Gilliam that a person named Sandy Martinez had met with him in El Salvador and made arrangements for him to enter the United States through Mexico.

Villatoro–Sarabia described his travels with Martinez from El Salvador and the actual border crossing into the United States. Martinez was on the Mexican side of a border canal. A "bushy–haired" man was on the U.S. side of the canal. (Moreno–Sandoval had bushy hair.) The two pulled a tube back and forth, carrying two or three aliens at a time across the canal. Villatoro–Sarabia identified his name, in his own handwriting, on the list found in Martinez–Morales' car.

Villatoro–Sarabia identified Martinez–Morales as "Sandy Martinez" from a photo spread. The government filed a criminal complaint against Martinez–Morales and Moreno–Sandoval for alien smuggling. Warrants were issued for their arrest. On September 3, 1979 Martinez–Morales was arrested at the port of entry. Insofar as this record shows, Moreno–Sandoval did not re–enter the United States.

On September 12, 1979 Martinez–Morales and Moreno–Sandoval were indicted. Villatoro–Sarabia, Gilliam, Lupin and agent Garcia testified against Martinez–Morales at a bench trial. At the close of the evidence Martinez–Morales moved to dismiss on the grounds that the government had released Moreno–Sandoval and returned him to Mexico. The motion was denied.

Martinez–Morales was convicted of encouraging and inducing Villatoro–Sarabia to enter the country illegally; aiding and abetting Moreno–Sandoval in bringing Villatoro–Sarabia into the country illegally; and falsely representing United States citizenship.

## DISCUSSION

### A. The *Mendez–Rodriguez* doctrine

Martinez–Morales contends the government violated his fifth amendment right to due process and his sixth amendment right to compulsory process by returning Moreno–Sandoval to Mexico before Martinez–Morales could interview him. He bases his argument on the *Mendez–Rodriguez* doctrine.

In *United States v. Mendez–Rodriguez*, 450 F.2d 1 (9th Cir. 1971) this court reversed the conviction of a defendant charged with conspiracy to smuggle and transport aliens. The government had interviewed and returned to Mexico three of the six illegal aliens who were passengers in the defendant's car at the time of his arrest. At an evidentiary hearing on the defendant's motion to dismiss the I&NS revealed that its policy was to retain custody of only three or four of the illegally transported aliens in these types of cases. The defendant had tried unsuccessfully to communicate with the returned aliens.

This court found that the defendant's fifth amendment right to due process and sixth amendment right to compulsory process had been violated by the government's actions. We found the defendant's inability to show that the missing witnesses would offer favorable testimony was irrelevant in light of the fact that the government's actions had prevented him from even conducting interviews.

The facts and factors underlying *Mendez–Rodriguez* were set out in *United States v. McQuillan*, 507 F.2d 30, 32–33 (9th Cir. 1974): (1) the then policy of the United States in alien smuggling cases of keeping select alien eyewitnesses while returning others to Mexico without affording the defense an opportunity to interview them and ascertain whether any would be able to give testimony favorable to the defendant; (2) the absence of any question that the aliens returned were in fact eyewitnesses to and active participants in the crime; (3) the defendant's defense theory that might have been corroborated by the missing witnesses; and (4) the strong probability that the missing witnesses could have provided material and relevant information concerning the events constituting the crime.

The *Mendez–Rodriguez* rule has been limited to situations in which the prospective witness escaped the subpoena power of the district court by the unilateral act of the prosecution. *United States v. Gonzales*, 617 F.2d 1358 (9th Cir. 1980) (witness released, but not deported); *United States v. Hernandez–Gonzalez*, 608 F.2d 1240 (9th Cir. 1979) (witness escaped into Mexico by trickery); *United States v. Carrillo–Frausto*, 500 F.2d 234 (9th Cir. 1974) (magistrate released two juvenile alien witnesses); *United States v. Verduzco–Macias*, 463 F.2d 105 (9th Cir.), *cert. denied*, 409 U.S. 883, 93 S.Ct. 173, 34 L.Ed.2d 139 (1972) (witness jumped farm–out program placement).

■ Bad faith on the part of the government need not be shown for a defendant to benefit from the ·*Mendez–Rodriguez* doctrine. Nevertheless, a lack of bad faith has been mentioned in several cases affirming the denial of motions to dismiss on *Mendez–Rodriguez* grounds. *See United States v. Castillo*, 615 F.2d 878, 882 (9th Cir. 1980); *United States v. Sanchez–Murillo*, 608 F.2d 1314, 1318 (9th Cir. 1979); *Carrillo–Frausto, supra*, 500 F.2d 234.

Although the majority in *Mendez–Rodriguez* expressly refused to impose a requirement that defendant show that the unavailable witnesses would have offered favorable testimony, subsequent cases have concluded that a defendant cannot "have suffered any constitutional deprivation by the government's transporting of alien witnesses beyond the reach of process unless the testimony that the witnesses might give could conceivably have benefited [the defendant]." *United States v. Orozco–Rico*, 589 F.2d 433 (9th Cir. 1978), *cert. denied*, 440 U.S. 967, 99 S.Ct. 1518, 59 L.Ed.2d 783 (1979). *See also Gonzales, supra*, 617 F.2d at 1363; *Hernandez–Gonzalez, supra*, 608 F.2d at 1246; *Sanchez–Murillo, supra*, 608 F.2d 1314; *United States v. Valdez*, 594 F.2d 725, 728 (9th Cir. 1979); *United States v. Ballesteros–Acuna*, 527 F.2d 928 (9th Cir. 1975); *United States v. Castellanos–Machorro*, 512 F.2d 1181 (9th Cir. 1975).

**B. The encouraging and inducing conviction**

Martinez–Morales argues that Moreno–Sandoval was a material witness to the acts constituting encouraging and inducing Villatoro–Sarabia to enter the United States illegally. He concedes that Villatoro–Sarabia's testimony was sufficient to establish at least that he encouraged and induced Villatoro–Sarabia to enter Mexico from El Salvador. He contends, however, that the crime was not complete without an entry into the United States, and that Villatoro–Sarabia's entry was witnessed by Moreno–Sandoval.

In *United States v. Castillo–Felix*, 539 F.2d 9 (9th Cir. 1976), this court held that even though all the acts constituting inducing occurred outside the country, the effect of the crime is here and a crime punishable under the laws of the United States is committed. ·

■ *Castillo–Felix* is not distinguishable on the grounds that in that case the inducing acts were committed in Mexico but here the acts were committed in El Salvador. Villatoro–Sarabia's testimony showed that Martinez–Morales encouraged and induced him to enter the United States *via* Mexico. The crime would have been completed had Martinez–Morales never gone to Mexico himself. Nothing Moreno–Sandoval could have testified to regarding the canal–crossing would have helped Martinez–Morales on the encouraging and inducing count. A "bare assertion that '[the deported alien] was an eyewitness to some of the alleged conspiratorial criminal activity, and might have exonerated the defendant' " is insufficient to raise a *Mendez–Rodriguez* claim. *Sanchez–Murillo, supra*, 608 F.2d at 1318. *See also, Orozco–Rico, supra*, 589 F.2d at 434; *Castellanos–Machorro, supra*, 512 F.2d at 1183.

Because Moreno–Sandoval was not a potential witness to the criminal act of encouraging and inducing Villatoro–Sarabia to enter the United States illegally, *Mendez–Rodriguez* does not apply.

C. The aiding and abetting conviction.

Moreno–Sandoval was clearly a potential material witness to the acts that were the basis of Martinez–Morales' conviction for aiding and abetting Villatoro–Sarabia's illegal entry into the United States. We hold, however, that the *Mendez–Rodriguez* doctrine does not apply for other reasons.

*Moreno–Sandoval* was returned to Mexico before government agents had any idea he might be a material witness to crimes committed by others. All of the aliens with whom he was found were deported and not charged with crimes. It was not until other aliens were found and an immigration officer happened to relate the events with which Moreno–Sandoval was connected to an attempted entry three days earlier that the government had any reason to suspect Moreno–Sandoval might be involved in crimes committed by Martinez–Morales. To extend *Mendez–Rodriguez* to this situation would require the government to detain all illegal aliens for an indefinite time so that persons apprehended later and suspected of being involved in their illegal entry could interview them. *Mendez–Rodriguez* does not go that far.

We said in *United States v. Tsutagawa*, 500 F.2d 420 (9th Cir. 1974):

"Since government investigators are not equipped with crystal balls to determine unexpected or unforeseen results, there may be some cases in which *Mendez–Rodriguez* does not apply." *Id.* at 422.

*Tsutagawa* was not such a case because the government had a reasonably small, known, and identifiable number of targets for possible prosecution when it returned the illegal aliens who were the subject of the crime to Mexico.

■ We hold that where, as here, the government is not aware of any possible connection between aliens it releases for voluntary departure or deports from this country and crimes for which another person is later charged, no constitutional principles are offended.

The convictions are AFFIRMED.