Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

————

Argued  February  26,  2004          Decided  July  23,  2004

No. 03-3060

UNITED STATES OF AMERICA,
APPELLEE

v.

JOSE DELGADO-GARCIA,
APPELLANT

————

Consolidated with
03-3067, 03-3068

————

Appeals from the United States District Court
for the District of Columbia
(No. 02cr00293-01)
(No. 02cr00293-02)
(No. 02cr00293-03)

————

  Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

*Tony Axam*, Assistant Federal Public Defender, argued the cause for appellants. With him on the briefs were *A. J. Kramer*, Federal Public Defender, and *Joseph Virgilio* and *Mona Asiner*, appointed by the court. *Iris E. Bennett*, Assistant Federal Public Defender, entered an appearance.

*David B. Goodhand*, Assistant U.S. Attorney, argued the cause for appellee. With him on the brief were *Roscoe C. Howard, Jr.*, U.S. Attorney, *John R. Fisher*, *Roy W. McLeese III*, and *Jeanne M. Hauch*, Assistant U.S. Attorneys.

Before: SENTELLE, RANDOLPH and ROGERS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* SENTELLE.

Concurring opinion filed by *Circuit Judge* RANDOLPH.

Dissenting opinion filed by *Circuit Judge* ROGERS.

SENTELLE, *Circuit Judge*: Each of the appellants, Jose Delgado-Garcia, Jose Prado-Morales, and César Bravo-Ceneño, pleaded guilty either to conspiring to induce aliens illegally to enter the United States, or to attempting to bring illegal aliens into the United States in violation of 8 U.S.C. § 1324(a). Despite those pleas, they took direct appeals and now attack their convictions on several grounds. We reject their claims and affirm the convictions.

I.

In their plea proffers, appellants admitted to conspiring to transport 191 Ecuadorian nationals in order to facilitate their illegal entry into the United States. Appellants attempted to transport the passengers via a 54-foot fishing vessel, the José Alexander II. Delgado-Garcia was the captain and piloted the ship. Bravo-Ceneño was the ship's mechanic. Prado-Morales was a crew member.

The ship's voyage began May 27, 2002, from a position some distance off-shore from Santa Elena, Ecuador. The plan apparently was to transport the Ecuadorians on the ship to Mexico, and for the Ecuadorians to enter the United States by land from there. On or about June 6, 2002, a United

States Navy helicopter sighted the vessel off the Guatemalan coast and recognized it as being overcrowded. Upon the approach of the helicopter, the vessel changed course. The vessel displayed no running lights, flew no flags, and had at least 70 passengers visible on the deck. Thereafter, the U.S.S. Fife, a United States Navy ship carrying a United States Coast Guard law enforcement detachment ("LEDET"), located the vessel, later identified as the José Alexander II, in international waters, 170 nautical miles south of Guatemala and Mexico. After monitoring the movements of the vessel, the LEDET hailed it to begin questioning, but received no response. The LEDET launched a boat from the U.S.S. Fife, approached the vessel, and attempted questioning from the boat. Migrants on board the José Alexander II responded to questioning that they had inadequate food, water, and fuel; that they had left Gayaquil, Equador, on May 27, 2002; and that the master and crew of the ship had left before the U.S.S. Fife's approach. After rendering assistance and verifying that one of the passengers could navigate the vessel to Guatemala, the LEDET advised the migrants to take the vessel to the port at Quetzal and escorted it there. Thereafter, LEDET personnel determined, based on interviews with the passengers and further investigation, that the ship had been attempting to facilitate the illegal immigration of the passengers to the United States.

A grand jury charged appellants with conspiracy to encourage and induce aliens illegally to enter the United States, in violation of 8 U.S.C. §§ 1324(a)(1)(A)(v), (a)(1)(A)(iv), and (a)(1)(B)(I), and attempted bringing of unauthorized aliens to the United States, in violation of 8 U.S.C. §§ 1324(a)(2) and (a)(2)(B)(ii). Appellants moved to dismiss the indictment on several grounds. They contended that the indictment did not charge an offense under § 1324(a), arguing that the statute does not apply extraterritorially. Appellants also asserted that their interdiction violated international law, as the José Alexander II, they claimed, was under the exclusive jurisdiction of Ecuador and the government of Ecuador did not consent to the U.S. government escorting that vessel to Ecuador. They argued, additionally, that the Fife's crew had

exceeded the authority granted under 14 U.S.C. § 89(a). That provision gives the Coast Guard authority, among other things, to "make inquiries, examinations, inspections, searches, seizures, and arrests upon the high seas and waters over which the United States has jurisdiction, for the prevention, detection, and suppression of violations of laws of the United States." Appellants claimed that this provision did not authorize the interdiction of the José Alexander II because it was in international, not U.S., waters when the Fife approached it, and because the crew lacked reasonable suspicion to believe that the vessel's crew was engaged in illegal activity that would affect the United States. Lastly, appellants argued that prosecuting them under § 1324(a) violated the Fifth Amendment's due process clause, as there was no "nexus" between appellants' conduct and the territory of the United States.

On January 31, 2003, the district court denied appellants' motion. Shortly thereafter, in February 2003, Prado-Morales and Bravo-Ceneño unconditionally pleaded guilty to the conspiracy count in the indictment and Delgado-Garcia unconditionally pleaded guilty to the attempt count. This appeal followed.

## II.

This direct criminal appeal comes to us in a strange posture. Appellants moved to dismiss the indictment on the statutory, constitutional, and international-law grounds they now raise on appeal. Yet they unconditionally pleaded guilty to the crimes of which they were charged. The first issue we address, therefore, is whether their unconditional pleas waived the claims they now assert on appeal. For the reasons that follow, we hold that these pleas waived all of appellants' claims. However, the government does not advance the argument that the unconditional pleas waived appellants' claim that § 1324(a) applies extraterritorially. The government has thus waived its waiver argument on that point. *Cf. United States v. Johnson*, 216 F.3d 1162, 1166 (D.C. Cir. 2000) (discussing the government's waiving of a

defendant's procedural default). We therefore reach the merits of appellants' claim that § 1324(a) does not apply extraterritorially.

Appellants assert four claims on appeal; these claims are, more or less, the same arguments that were the basis of their motion to dismiss the indictment. First, appellants reassert their claim that the substantive statute which they by their pleas admitted violating, 8 U.S.C. § 1324(a), does not apply extraterritorially, and therefore not to them in this case. Second, appellants argue that the government failed to prove that they committed a crime with effects in the United States, and therefore did not prove a "nexus" between appellants' conduct and the United States, as they claim the Fifth Amendment's due process clause requires. Third, appellants assert that their prosecution violated 14 U.S.C. § 89(a), for the same reasons they asserted below. Finally, appellants claim that their apprehension violated customary international law and a treaty to which the United States is a party.

Appellants waived all of these claims by pleading guilty unconditionally. Unconditional guilty pleas that are knowing and intelligent – and there is no claim that appellants' pleas were otherwise – waive the pleading defendants' claims of error on appeal, even constitutional claims. *See, e.g., United States v. Drew*, 200 F.3d 871, 876 (D.C. Cir. 2000). There are two recognized exceptions to this rule. The first is the defendant's claimed right "not to be haled into court at all;" for example, a claim that the charged offense violates the double jeopardy clause. *Blackledge v. Perry*, 417 U.S. 21, 30-31 (1974); *see also Menna v. New York*, 423 U.S. 61, 62-63 & n.2 (1975) (per curiam). This is the so-called "Blackledge/Menna" exception. The second is that the court below lacked subject-matter jurisdiction over the case, as a claim of lack of subject-matter jurisdiction, "because it involves a court's power to hear a case, can never be forfeited or waived." *United States v. Cotton*, 535 U.S. 625, 630 (2002) (citing *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 89 (1998)).

None of appellants' claims falls into either of these exceptions. As to the subject-matter jurisdiction exception: there is no question that the district court had subject-matter jurisdiction over appellants' case. Appellants' best argument to the contrary rests on their claim that the indictment failed to state an offense, which they claim deprived the district court of subject-matter jurisdiction over them. The government apparently agrees with appellants that this purported defect in the indictment concerns the district court's subject-matter jurisdiction over appellants' case, rather than the merits of the case.

We do not agree. Under Article III of the Constitution, "[t]he judicial power of the United States" is "vested . . . in such inferior Courts as Congress may from time to time establish." U.S. Const. art. III, § 2. Congress conferred original jurisdiction on the district court over appellants' case by enacting 18 U.S.C. § 3231. That statute, passed originally in 1948, *see* 62 Stat. 826, provides that the "district courts of the United States shall have original *jurisdiction* . . . of all offenses against the laws of the United States." The ordinary meaning of the term "jurisdiction" at the time that statute was passed referred to a court's power to "declar[e] and administer[ ] law or justice." 5 The Oxford English Dictionary 635 (1933); *see also* Webster's Third New International Dictionary 1227 (1961). Section 3231 identifies "offenses against the laws of the United States" as the relevant "law" over which the court has "power" (or "jurisdiction"). The power to declare that law includes the power to decide whether the offense charged is a true offense, for, as Justice Holmes noted long ago, that power remains whether the court's "decision" on the law (in this instance, the court's judgment as to the "offense") "is right or wrong." *Lamar v. United States*, 240 U.S. 60, 65 (1916) (noting that "[t]he objection that the indictment does not charge a crime against the United States goes only to the merits of the case" rather than the court's jurisdiction). The district court's subject-matter jurisdiction in this case therefore included the power

to decide whether the indictment charged a proper "offense."[1]

None of the statutory or constitutional provisions appellants cite divested the district court of its original jurisdiction under § 3231. The substantive statute appellants pleaded guilty to violating, 8 U.S.C. § 1324(a), does not so much as mention the court's "jurisdiction." The treaty to which appellants point us – The Convention on the High Seas – does state that "ships that sail under the flag of one State only . . . shall be subject to its exclusive jurisdiction on the high seas." Convention On the Law of the Sea, Sept. 30, 1962, art. 6, § 1, 13 U.S.T. 2312. "Jurisdiction" in this sense, however, refers to the general authority of the U.S. government over the ship at issue, including the executive branch's authority, not the power of the district court in particular over prosecutions arising out of the executive's assertion of such authority. The term "jurisdiction" is also used in this way in 14 U.S.C. § 89(a), and in the customary international law doctrines to which appellants point us. Finally, appellants' Fifth Amendment claim is irrelevant to the court's Article III subject-matter jurisdiction. The Constitution by its terms leaves it solely to Congress to allocate that power by statute, and there is no claim in this case that this jurisdictional grant is somehow independently unconstitutional.

Precedent bolsters our conclusion that the substantive sufficiency of the indictment is a question that goes to the merits of the case, rather than the district court's subject-matter jurisdiction. The Supreme Court's decision in *United States v. Cotton*, 535 U.S. 625 (2002), supports this conclusion. There, the Court held that the failure of an indictment to state a sentencing element required to be submitted to the jury and proven beyond a reasonable doubt was not a jurisdictional defect that required automatic reversal of the conviction. *Id.* at 630-31. "Defects in an indictment do not deprive a court of its power to adjudicate a case," the Court explained; the issue of the indictment's substantive sufficien-

---

[1] We express no view on what remedies would be available to such a defendant asserting inadequate legal counsel after having pleaded guilty.

cy instead goes to the merits. *Id.* We also note that at least two circuits have held that the question of an indictment's failure to state an offense is an issue that goes to the merits of a case, not the district court's subject-matter jurisdiction. *See United States v. Gonzalez*, 311 F.3d 440, 442 (1st Cir. 2002), *cert. denied*, 124 S. Ct. 47 (2003); *United States v. Brown*, 164 F.3d 518, 520-22 (10th Cir. 1998).

Nor do appellants' claims fall into the second, Blackledge/Menna exception. That exception concerns the right of defendants "not to be haled into court at all" as that phrase was used in *Blackledge v. Perry*, 417 U.S. 21 (1974), and *Menna v. New York*, 423 U.S. 61 (1975) (per curiam). *Perry*, the case in which the Court first applied this exception, involved a defendant whom the state of North Carolina had convicted of misdemeanor assault and given a six-month sentence. After the defendant filed his notice of appeal from that conviction, the state prosecutor obtained an indictment against him on a felony assault charge based on the same conduct that gave rise to the misdemeanor charge. 417 U.S. at 22-23. Perry pleaded guilty to that charge, but later claimed that the second charge violated his due-process rights because the charge penalized him for exercising his statutory right to appeal. *Id.* at 25-26. The Supreme Court held that Perry's guilty plea did not waive his due-process claim, because Perry's constitutional claim of prosecutorial vindictiveness "went to the very power of the state to bring [Perry] into court to answer the charge brought against him." *Id.* at 30. The right, the Court reasoned, was the "right not to be haled into court at all upon the felony charge," and therefore implicated the "distinctive" procedural injury against which a right "to prevent a trial from taking place at all" protects. *Id.* at 30-31. The Court later clarified that the *Blackledge* exception applies to double jeopardy claims. *Menna*, 423 U.S. at 62-63.

The injury associated with appellants' claims is not comparable to the injury the Supreme Court identified in *Blackledge* and *Menna*. Appellants' only constitutional claim is that their prosecution violates the Fifth Amendment's due process clause because "none of the specific actions attributed

to appellants were aimed at causing criminal acts within the United States." Br. for Appellants at 20. That assertion is a claim that the due process clause limits the substantive reach of the conduct elements of 8 U.S.C. § 1324(a), not a claim that the court lacks the power to bring them to court at all. Even if the prosecution of appellants violated the Fifth Amendment for this reason, appellants would still need to come to "court to answer the charge brought against" them. *Blackledge*, 417 U.S. at 30.

In any event, even assuming that appellants' Fifth Amendment claim concerns the power of the court to force them to appear, that claim still is waived. The indictments clearly alleged that appellants intended to smuggle aliens into the United States, thereby causing effects there. While appellants would have us look beyond the indictment to the underlying facts surrounding the interdiction of the José Alexander II to show the absence of a nexus, there was no arguable *facial* constitutional infirmity in the indictment, and the Blackledge/Menna waiver exception does not apply. *See United States v. Brace*, 488 U.S. 563, 575 (1989).

For these reasons, as a matter of pure legal principle, appellants' guilty pleas waived all of their claims. That conclusion is sufficient to dispose of all of appellants' claims on appeal, save for their claim that 8 U.S.C. § 1324(a) does not apply extraterritorially. However, the government's brief strangely "assumes for present purposes" that appellants have not waived their claim as to the extraterritorial application of § 1324(a). The government has therefore waived its waiver argument on that point. *See United States v. Johnson, supra.*

## III.

The government's concession impels us to decide whether § 1324(a) criminalizes appellants' extraterritorial conduct. We hold that it does.

Appellants pleaded guilty to two distinct crimes. Prado-Morales and Bravo-Ceneño pleaded guilty to conspiracy to encourage and induce aliens illegally to enter the United

States. The statute that defines that crime prohibits conspiring to

> encourage[ ] or induce[ ] an alien to come to, enter, or reside in the United States, knowing or in reckless disregard of the fact that such coming to, entry, or residence is or will be in violation of law.

8 U.S.C. § 1324(a)(1)(A)(iv), (a)(1)(A)(v)(I). The second crime, to which Delgado-Garcia pleaded guilty, is the attempted bringing of unauthorized aliens to the United States. The statute that defines that crime provides:

> Any person who, knowing or in reckless disregard of the fact that an alien has not received prior official authorization to come to, enter, or reside in the United States, brings to or attempts to bring to the United States in any manner whatsoever, such alien, regardless of any official action which may later be taken with respect to such alien, for each alien in respect to whom a violation of this paragraph occurs

commits a federal crime. *Id.* § 1324(a)(2).

Both of these statutes apply extraterritorially. Appellants' argument that they do not invokes the presumption against reading statutes to have extraterritorial effect. *See, e.g., Sale v. Haitian Centers Council, Inc.*, 509 U.S. 155, 173 (1993); *EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 250-51 (1991). This presumption, properly understood, does not mean that § 1324(a) criminalizes only domestic conduct. The presumption against extraterritorial application of domestic statutes "is based on the assumption that Congress is primarily concerned with domestic conditions." *Foley Bros. v. Filardo*, 336 U.S. 281, 285 (1949); *see also Smith v. United States*, 507 U.S. 197, 206-07 n.5 (1993). This presumption embodies sensible contextual linguistic reasons for reading the plain texts of domestic statutes not to apply everywhere in the world. Because Congress's primary arena of sovereignty is the territorial United States, it makes sense to presume, absent other evidence, that its commands linguistically apply only there. Therefore, we presumptively read the text of

congressional statutes not to apply extraterritorially, unless there are contextual reasons for reading the text otherwise.

As the dissent points out, the presumption, and indeed the underlying proposition that Congress legislates primarily with domestic conditions in mind, in part makes sense because we assume that Congress desires to avoid conflict with other nations. That helps explain why we presume statutes not to apply extraterritorially, unless there are contextual reasons for reading the text otherwise. Contextual reasons, in our view, supply the "affirmative evidence" the Supreme Court requires to overcome the presumption.

The dissent suggests that our discussion of this presumption conflicts with dictum in *Kollias v. D & G Marine Maintenance*, 29 F.3d 67 (2d Cir. 1994). Dissent at 3. In fact, we agree with the Second Circuit's statement (which was not essential to its holding, as the court held that the statute in question did in fact apply extraterritorially, *id.* at 73-75) that "all statutes, without exception, [should] be construed to apply within the United States only, unless a contrary intent appears," *id.* at 71. Our point is that contextual factors show that Congress had a contrary intent in this case.

The presumption embodies a sensible caution against reading statutes lightly to apply outside U.S. borders. Like any linguistic convention, it depends on contingent real-world assumptions. The point of the policy concerns "behind" the presumption against applying statutes to have extraterritorial effect is that they mean that a court should ordinarily understand Congress's commands to apply only within U.S. borders, not that a court should itself apply those policy concerns to the case at bar and read the statute based on the result of its own policy analysis. Because, as the dissent correctly states, "[d]ecisions about when to subject foreign nationals and foreign conduct to the United States' laws invoke delicate questions of jurisdiction and international relations" and because "courts ... lack the foreign policy expertise of the legislative and executive branches," dissent at 2, we must apply the canons of construction to interpret, not rewrite, congressional acts. However, in examining the statute for

congressional intention of extraterritorial application, we consider both contextual and textual evidence. That is what our analysis below represents.

Read in context, § 1324(a) applies extraterritorially. On its face, it concerns much more than merely "domestic conditions." It protects the borders of the United States against illegal immigration. As the terrorist attacks of September 11, 2001 reminded us starkly, this country's border-control policies are of crucial importance to the national security and foreign policy of the United States, regardless whether it would be possible, in an abstract sense, to protect our borders using only domestic measures. This contextual feature of § 1324(a) establishes that it is fundamentally international, not simply domestic, in focus and effect. The presumption that Congress's commands do not reach those outside the borders of the United States is overcome by affirmative contextual evidence of congressional intent. It is natural to expect that a statute that protects the borders of the United States, unlike ordinary domestic statutes, would reach those outside the borders. It makes no sense to presume that such a statute applies only domestically. We agree with the dissent that whether a statute should apply extraterritorially is a judgment for Congress, dissent at 11; our point is that this contextual feature shows that this is the judgment Congress made in § 1324(a).

But more than simply the fact that this statute is international in focus shows that it applies extraterritorially. There is also specific textual evidence that, as the Supreme Court observed in *United States v. Bowman*, "the natural inference from the character of the offense[s]" is that an extraterritorial location "would be a probable place for [their] commission." 260 U.S. 94, 99 (1922). That evidence strengthens our conclusion that, read in context, these crimes apply to extraterritorial conduct.

The Supreme Court's decision in *Bowman* supports the validity of this inference. *Bowman* was a case in which the Supreme Court concluded that the crime of defrauding a corporation in which the United States was a stockholder

applied to U.S. citizens abroad. *Id.* at 102-03. *Bowman*, we acknowledge, is not directly on point. *Bowman* involved criminal defendants who were U.S. citizens and the offense was fraud against the United States, *id.* at 102-03; this case, in contrast, involves aliens and immigration offenses. These differences, however, do not lessen *Bowman*'s force as applied to this case. The first difference, the citizenship of the defendants, is irrelevant. While *Bowman* did qualify its holding by noting that no aliens were before the Court, *Bowman*'s logic did not depend on this fact. The *Bowman* Court's reasoning was much more pointed than that. The Court noted that the fraud statute under which the prosecution in *Bowman* was proceeding was amended in 1918 to extend its protection, theretofore limited to government departments, to "any corporation in which the United States of America is a stockholder." From the timing of the amendment, the Court reasoned that Congress intended to protect the Emergency Fleet Corporation. *Id.* at 101-02. The Court therefore concluded that the statute criminalizing defrauding a U.S. corporation applied extraterritorially because the Emergency Fleet Corporation, a U.S. corporation, "was expected to engage in, and did engage in, a most extensive ocean transportation business." *Id.* at 101. Because of this expectation, the Court reasoned, many persons who commit the crime of defrauding a U.S. corporation would do so overseas, and therefore the statute had extraterritorial application. *Bowman* is therefore analogous because, as discussed more fully below, the same expectation holds of § 1324(a). For these reasons, we disagree with the dissent that the fact that *Bowman* involved a U.S. citizen lessens its force as applied to this case. Dissent at 5.

The second main difference between this case and *Bowman* – that this case involves immigration offenses rather than frauds against the United States – shows that *Bowman* applies with even greater force to § 1324(a). Fraud against the United States does not necessarily concern the national security and foreign affairs of the United States, unlike § 1324(a). Moreover, there is no obvious reason why frauds against the United States, simpliciter, would occur overseas,

apart from the expectation that the Emergency Fleet Corporation would engage in extensive overseas operations. However, there is every reason to think that much of the conduct that § 1324(a) criminalizes occurs beyond the borders of the United States. In reaching its conclusion that the fraud statute before it in *Bowman* applied extraterritorially, the Supreme Court recited several other statutes, not expressly territorial, but which might by the very nature of the crime outlawed be supposed to apply extraterritorially. Among these, Chief Justice Taft, for the Court, noted the punishment of a consul who knowingly certified a false invoice, the forging or altering of a ship's papers, the enticing of desertions from naval service, and the bribing of a United States officer in civil, military, or naval service. As to all of these, the Court noted that Congress "clearly" intended the locus of the crime to be in foreign countries, on the high seas, or otherwise extraterritorial. 260 U.S. at 99. In short, *Bowman* is a most persuasive precedent for a conclusion that § 1324(a) applies extraterritorially.

The dissent's attempt to distinguish *Bowman* in other respects is unpersuasive. The dissent opines that *Bowman* is distinguishable because unlike this case, *Bowman* and other internationally focused statutes concern crimes that would "harm the United States government even if [they were] completed abroad," dissent at 6, and because in this case, the harm is "less direct and less immediate." *Id.* Such policy reasoning is for Congress, not this Court, in the first instance. Anyway, it is difficult to see how the harm threatened by attempted illegal immigration is any less "direct and immediate" than, say, the crime of conspiring to commit a terrorist act against an American target. The border-control statutes at issue here are "not logically dependant on their locality" in the same sense that the fraud offense against the United States was not in *Bowman*: they have many obvious extraterritorial applications.

Like the statute at issue in *Bowman*, § 1324(a), by its terms, applies to much extraterritorial conduct. Subsections (a)(1)(A) and (a)(2) of that provision both proscribe "attempts to bring" aliens "to the United States." Many incomplete

attempts occur outside the territorial jurisdiction of the United States. "Bringing" someone suggests entry – or at least physical proximity. Because an alien will not be in the United States if the attempt is incomplete, the offender will ordinarily also be outside the United States during the attempt. This is true even if the government foils many incomplete attempts at the borders of the United States. That many attempts to bring someone into the United States will occur outside the United States is strongly suggestive that these subsections and their neighbors apply, as a matter of ordinary language, to extraterritorial acts. For this reason, we disagree with the dissent that the text of § 1324(a) is equally amenable to a purely domestic reading in light of *Bowman*.

Appellants' response to this argument is not persuasive. Appellants' counsel at oral argument argued that any substantive offense may be joined with an attempt statute; therefore, they claim, this reasoning would eviscerate the presumption against extraterritorial application of statutes, since any substantive statute could have extraterritorial application simply by being joined with an attempt statute. In fact, our holding will create no such sweeping precedent. The attempt provisions of § 1324(a) have extraterritorial application not because they are attempt crimes, but rather because offenders will often be outside the United States when they attempt to commit the crime. This feature of § 1324(a) does not result not from the fact that it punishes attempts. It results from the fact that the crime involves transporting aliens into the United States.

The forfeiture provision applicable to § 1324(a) bolsters the inference that § 1324(a) applies extraterritorially. It provides:

> Any conveyance, including any vessel, vehicle, or aircraft, which has been or is being used in the commission of a violation of subsection (a) of this section shall be seized and subject to a forfeiture.

8 U.S.C. § 1324(b)(1). The breadth of this provision strongly suggests that subsection (a) itself has extraterritorial applica-

tion. Vessels, vehicles, and aircraft used in committing violations of subsection (a) are often used internationally, as transporting illegal immigrants requires movement from one country to another. Therefore, § 1324(b)(1) itself has extraterritorial application. It seems unlikely that Congress would give the government broad power to seize the conveyances used to effect illegal immigration in subsection (b)(1) without simultaneously conferring the power, in subsection (a), to punish the offenders operating those conveyances internationally. Congress would not, for example, have given the executive the power to seize ships abroad if it were not also possible to convict those operating the ships abroad, and it is a traditional canon of statutory construction to construe related statutory provisions in similar fashion. Our reasoning on this score is, therefore, not "circular," dissent at 10; our point is that such a reading would be textually strange in light of the independent fact that (b)(1), as the dissent does not deny, applies extraterritorially. Reading § 1324(a) to have extraterritorial application thus harmonizes these related provisions.

Finally, the prohibition on encouraging or inducing illegal immigration, § 1324(a)(1)(A)(iv), also has many natural extraterritorial applications. Certainly it is possible to induce a potential illegal immigrant to come to the United States from within the United States, as appellants and the dissent emphasize, but it is obviously much easier to do so when in proximity to the immigrant. It is also possible to conspire to induce illegal immigration into the United States from anywhere in the world; but, again, it is easier to do so outside the United States, in proximity to those who carry out the plot. This provision therefore by its terms contemplates application to much extraterritorial conduct.

Nothing in *Sale* and *Arabian Oil Co.* compels the conclusion that § 1324(a) applies only domestically. Those decisions involved very different statutes. Although *Sale* also involved an immigration statute, that statute was crucially different from § 1324(a). The statute in *Sale*, 8 U.S.C. § 1253(h), governed deportation proceedings. The Court, quite apart from the presumption against extraterritorial

application, read this provision, by its terms, to apply only to *domestic* deportation proceedings and "contemplated that such proceedings would be held in the country," as the statute referred specifically to the Attorney General, a domestic official, and the Attorney General was not authorized to conduct deportation proceedings outside of the country. 509 U.S. at 173. In contrast, § 1324(a) is not fundamentally domestic in focus, but has a great many international applications.[2]

Similarly, the statute in *Arabian Oil Co.* involved "boilerplate" language "which can be found in any number of congressional Acts, none of which have ever been held to apply overseas." 499 U.S. at 250-51. The objective evidence of extraterritorial application the Court found lacking there, in contrast, is present in § 1324(a). The language of § 1324(a) is distinctive, not boilerplate, and applies to a great many acts that one customarily would expect to occur overseas.

The Supreme Court's recent decision in *F. Hoffman-La Roche Ltd. v. Empagran S.A.*, 124 S. Ct. 2359 (2004), dissent at 2, is not to the contrary. *Empagran* was an international price-fixing antitrust suit against several foreign and domestic vitamin manufacturers and distributors. *Id.* at 2364. The Court held that plaintiffs' suit failed to state a claim under U.S. antitrust statutes, assuming that plaintiffs' suit only

---

[2] The *Sale* Court stated that even if it did not read the act by its terms to apply only to "strictly domestic procedures, the presumption that Acts of Congress do not ordinarily apply outside our borders would support" a purely domestic interpretation of the relevant statute. 509 U.S. at 173. Even if the language of the statute did not apply solely to "domestic procedures," however, that does not change the fact that this language referred specifically to the Attorney General, a domestic official, and that the Court applied the presumption to that statute as it was written, not to some hypothetical statute that omitted those words. Our point is that these words are very different from the language in the statute at issue here and therefore that our application of the presumption compels the conclusion that § 1324(a) applies to extraterritorial conduct.

alleged international anticompetitive effects that were completely independent from any adverse domestic effects. *Id.* at 2366-72. The Court rejected plaintiffs' argument that the "more natural reading" of the statutes was that they could state a claim solely based on such effects, because of the presumption against applying statutes extraterritorially and because the Court read the statutes to permit, but not require, either a foreign or domestic reading. *Id.* at 2366, 2372.

The Supreme Court's rejection of plaintiffs' argument is consistent with our textual analysis of § 1324(a). In *Empagran*, the Court assumed for purposes of analysis that plaintiffs' suit alleged foreign conduct that lacked any domestic nexus whatsoever. The Court acknowledged that "our courts have long held that application of our antitrust laws to foreign anticompetitive conduct is nonetheless reasonable, and hence consistent with the principles of prescriptive comity, insofar as they reflect a legislative effort to redress *domestic* antitrust injury that foreign anticompetitive conduct has caused." *id.*, at 2366-67 (quoting *United States v. Aluminum Co.*, 148 F.2d 416, 443-44 (2d Cir. 1945) (L. Hand, J.) (citing, among other cases, *United States v. Bowman*)), even though no express language in those laws made such foreign conduct unlawful. That long-standing recognition that the antitrust laws apply to such foreign conduct that impinges on domestic affairs supports our interpretation of the statute before us, as the offenses before us have such effects.

Nor are we persuaded by appellants' and the dissent's citation to the Maritime Drug Law Enforcement Act, 47 U.S.C. App. §§ 1901-03. This act criminalizes the manufacture, distribution, and possession of controlled substances, and explicitly applies to extraterritorial acts. *Id.* § 1903(a), (h). Appellants argue, and the dissent repeats, that because this statute is similar to § 1324(a), yet explicitly applies extraterritorially, we should infer from the absence of the same explicit statement in § 1324(a) that it does not apply extraterritorially.

We do not find it surprising that Congress chose to use more explicit language specifying extraterritorial application in the Maritime Drug Law Enforcement Act than it did in § 1324(a). A border-control statute is more outward-looking than is a prohibition on drug manufacturing. That may well be why Congress also thought it necessary to specify explicitly in the Enforcement Act that "trafficking in controlled substances aboard vessels is a serious international problem." 46 U.S.C. App. § 1902. The international focus of § 1324(a), in contrast, is more obvious. Although appellants are correct that, where Congress uses different language in otherwise similar provisions, it is wise to presume that Congress means different things, § 1324(a) and the Enforcement Act are not sufficiently otherwise similar to invoke that reasoning.

We recognize that our holding as to the extraterritorial application of the attempt provisions of § 1324(a) conflicts with *Yenkichi Ito v. United States*, 64 F.2d 73, 75 (9th Cir. 1933). The Ninth Circuit rested this holding on its assumption that "there is nothing in [§ 1324(a)] to indicate that Congress intended it to be effective outside of the recognized territorial limits of the United States." *Id.* As we have discussed, we disagree.

Our dissenting colleague relies on the legislative history of § 1324(a), dissent at 12-13, citing the 1903 congressional act that added the attempt provision of § 1324(a) and the recodification of that act in 1917, and arguing that there is nothing in this history that "suggest[s] that the 1903 substitution of the term 'attempt' for 'aid' was intended to expand the bringing offense extraterritorially," dissent at 13. Such silence proves little, in light of the fact that, as we have discussed, the evidence is apparent from the text of § 1324(a). The same can be said of the silence the dissent cites in the legislative history of the encouragement/inducement provision of § 1324(a). Dissent at 13-15.

Second, the dissent points out that the Ninth Circuit handed down its decision in *Yenkichi Ito* in 1933, and that Congress has nowhere attempted to correct that understanding in subsequent amendments to § 1324(a). Dissent at 13-15.

This argument fails on two fronts. For one, the Supreme Court decided *United States v. Bowman* in 1922, a case that the Ninth Circuit did not cite, so it is unclear whether Congress's silence was the result of its understanding that the plain textual evidence it had supplied already made the extraterritorial application of the statute clear under the reasoning of *Bowman*. For another, other elderly Court of Appeals cases, including cases from the Ninth Circuit, have long held the closely related inducement section of the statute capable of extraterritorial application. Most glaringly, the Fifth Circuit held as much in *Claramont v. United States*, 26 F.2d 797 (5th Cir. 1928) (per curiam), a decision that, like *Yenkichi Ito*, was the law of a circuit whose decisions governed large portions of the U.S. coast. *See also United States v. Nunez*, 668 F.2d 10, 12-13 (1st Cir. 1981) (per curiam) (same, citing *Castillo-Felix*); *United States v. Castillo-Felix*, 539 F.2d 9, 12-13 (9th Cir. 1976) (same, citing *Bowman*); *United States v. Correa-Negron*, 462 F.3d 613, 614 (9th Cir. 1972) (per curiam) (same, citing *Claramont*). Therefore, the state of the law dating from 1922 on the extraterritorial application of § 1324(a) is, at best, ambiguous, and at worst, contrary to the dissent's position in view of *Bowman*. Congress's silence on this point thus does not support the dissent's reading of the statute.

Third, the dissent cites a single sentence from a letter from the Department of Justice commenting on the current version of the Immigration and Control Act of 1986, then pending before the House Committee on the Judiciary, which the Committee appended to a House Report on the bill. The dissent says that the Department said in this sentence that it "would not prosecute the attempted bringing offense outside of the United States." Dissent at 14-15. Citing two Court of Appeals cases, as we read the letter, the Department opined that the encouragement/inducement provision of § 1324(a) "is the only provision in [that section] that has extra-territorial application." H.R. Rep. No. 99-682, pt. 1, at 112 (1986). Putting to one side that this piece of history contradicts the dissent's conclusion that the encouragement/inducement section does not have extraterritorial application, we think it

does not stand for the proposition that the encouragement/inducement provision of § 1324(a) applies only domestically. The only support the Department offered for its opinion was a citation to two Court of Appeals cases, both of which held only that the encouragement/inducement provisions of § 1324(a) did not have extraterritorial application. *See id.* (citing *Nunez*, *Castillo-Felix*, and "cases cited therein"). Those cases and the cases those cases cited, however, said nothing about whether the attempt provision of § 1324(a) had extraterritorial application. In light of that silence, we think that the Department was merely stating its opinion that no *court cases* have held the attempt provisions to have extraterritorial application. It was not stating its official interpretation of § 1324(a). We therefore give this piece of legislative history little weight.

We close with a concluding observation on the alarming consequences the dissent sees in our holding. Dissent at 17-19. The dissent raises the specter that our holding that § 1324(a) applies extraterritorially risks creating conflicts with the laws of other nations, and that we should not do so given our lack of foreign policy expertise. As we have discussed, we have confined our analysis to interpreting the words of Congress in light of the presumption against extraterritorial application, not foreign policy analysis. But it is worth pointing out that, in any event, our holding does not pose a significant risk of creating any such conflict. While we lack foreign policy expertise, the executive branch, the branch of government primarily concerned with foreign affairs and the branch charged with administering § 1324(a), has it in spades. The practical consequence of our holding is merely to leave the question of how best to navigate such potential conflicts to the executive, "the sole organ of the federal government in the field of international relations." *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 320 (1936). The executive's expert exercise of prosecutorial discretion and foreign diplomacy should be more than sufficient to avoid the conflicts the dissent thinks our holding risks creating.

22

IV.

Although the dissent believes that "the combination of a statutory text that permits but does not require extraterritorial application and a silent legislative history is not enough of a basis for a court to decide to apply" a statute extraterritorially, dissent at 16, the same textual evidence used by the Supreme Court in *Bowman* and § 1324(a)'s international focus suggest otherwise. For those two reasons, and others expressed above, appellants' convictions are affirmed.

RANDOLPH, *Circuit Judge*, concurring: I join all of the court's opinion except its statement that by pleading guilty a defendant waives any claim that the offense to which he pled guilty is not a crime. *United States v. Idowu*, 105 F.3d 728 (D.C. Cir. 1997), suggests a view contrary to the court's. The issue was neither briefed nor argued and, for the reasons the court gives, did not need to be reached.

1

ROGERS, *Circuit Judge*, dissenting: The court today interprets two provisions in the Immigration and Nationality Act as criminalizing conduct outside of the United States by foreign nationals. In doing so, the court ignores clear instruction from the Supreme Court that Congress must clearly state its intention to apply statutes extraterritorially and that otherwise courts are to interpret ambiguous statutes as territorially limited. Congress has not clearly stated its intent to apply the attempted bringing and the encouragement/inducement provisions of 8 U.S.C. § 1324 extraterritorially in order to protect United States borders, and the structure and operation of the two provisions, in which this court finds an implicit command of extraterritorial application, are consistent with the territorial limitation that is generally presumed of statutes. Moreover, the legislative history is clear that Congress did not intend the attempted bringing provision to apply outside the territorial jurisdiction of the United States. Accordingly, because there is no clear "affirmative evidence," *Sale v. Haitian Centers Council, Inc.*, 509 U.S. 155, 176 (1993), to overcome the presumption against applying a statute extraterritorially, the indictments under 8 U.S.C. §§ 1324(a)(1)(A)(i), (a)(1)(A)(iv), and (a)(1)(A)(v) should have been dismissed, and I therefore respectfully dissent.

## I.

The Supreme Court has long upheld a canon of statutory construction that "legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States." *EEOC v. Arabian American Oil Co.*, 499 U.S. 244, 248 (1991) (quoting *Foley Bros., Inc. v. Filardo*, 336 U.S. 281, 285 (1949)). In two recent cases, *Sale*, 509 U.S. 155, and *Arabian American Oil Co.*, 499 U.S. at 248–59, the Court has re-emphasized this longstanding presumption in uncompromising terms: laws are deemed to only apply within the territorial jurisdiction of the United States unless Congress provides "affirmative evidence" to the contrary. *See Sale*, 509 U.S. at 176. Such evidence must be "clearly expressed." *Arabian American Oil Co.*, 499 U.S. at 248. While the canon in part has roots, as this court notes, *see* Opinion at 10–11, in the recognition that Congress "is

primarily concerned with domestic conditions," *Arabian American Oil Co.*, 499 U.S. at 248, it also reflects "the desire to avoid conflict with the laws of other nations." *Sale*, 509 U.S. at 174. Decisions about when to subject foreign nationals and foreign conduct to the United States' laws involve delicate questions of jurisdiction and international relations, and courts, which lack the foreign policy expertise of the legislative and executive branches, must tread carefully and err on the side of limiting statutes to domestic application if there is doubt as to Congress' intentions. This Term the Supreme Court re-emphasized in *F. Hoffman–La Roche Ltd. v. Empagran S.A.*, 124 S. Ct. 2359, 2366 (2004), that it "ordinarily construes ambiguous statutes to avoid unreasonable interference with the sovereign authority of other nations." If a statute is unclear and reasonably permits the reading that it applies only territorially, the court should not read it to apply abroad, even if doing so might be "the more natural reading of the statutory language." *Id.* at 2372. Nothing in the Supreme Court's opinions in *Sale* and *Arabian American Oil*, both of which used broad and generalized language, or the recent opinion in *Empagran*, indicates that the Court was doing anything other than announcing, and strengthening, a generally applicable rule of statutory construction.

This court, however, now reaches a holding that effectively eviscerates this instruction. Treating the canon as nothing more than a "contextual rule" or "linguistic" principle, it states that the presumption against extraterritoriality can be overcome so long as there are "contextual reasons" for disregarding it. Specifically, this court's principal argument is that the canon's requirement of "affirmative evidence" is satisfied when a statute concerns "more than merely 'domestic conditions.'" Op. at 12. In other words, if a statute deals with a subject area that is not purely domestic, the court reasons, that provides the "context" indicating Congress' intent to apply the statute extraterritorially. *See id.* This cramped view of the canon is circular, making its applicability depend in the first instance on whether a statute is "domestic" when that is the question that application of the canon is supposed to resolve. Moreover, the court's "contextual rea-

sons for reading the text otherwise" standard lacks a basis in the jurisprudence of the Supreme Court, which has stated that the standard for overcoming the canon against extraterritoriality is the higher hurdle of "affirmative evidence," *Sale*, 509 U.S. at 176, and must be "clearly expressed." *Arabian American Oil Co.*, 499 U.S. at 248. The court's premise that a non-domestic subject itself supplies the "affirmative evidence" sufficient to overcome the canon, *see* Op. at 11–12, is in direct conflict with the Second Circuit, which explained in *Kollias v. D & G Marine Maintenance*, 29 F.3d 67 (2nd Cir. 1994), in light of the Supreme Court's recent decisions that "seem to require that *all* statutes, without exception, be construed to apply within the United States only, unless a contrary intent appears" (as it did in the statute at issue, which applied "on the high seas," *id.* at 73–74), that a non-domestic subject matter does not suffice to render inapplicable the canon against extraterritoriality. *Id.* at 71 (emphasis in original). While certain subject areas (such as the Immigration and Nationality Act, at issue in *Sale* and the instant case, or maritime law as in *Kollias*) may imply that Congress is more than "primarily concerned with domestic conditions," *Arabian American Oil Co.*, 499 U.S. at 248, they do nothing to alleviate the prudential concerns embodied in the canon, which the court today ignores.

The prudential concerns behind the canon are particularly significant in the criminal context, where the extraterritorial application of the criminal law of the United States may criminalize conduct that is legal in the countries in which it is committed, without providing corresponding constitutional protections against unreasonable searches and seizures, and the use of force at the arrest stage. *Cf. U.S. v. Verdugo–Urquidez*, 494 U.S. 259 (1990). Exposing foreign nationals to the full coercive force of the United States' criminal laws without many of the corresponding constitutional protections is a serious step, not only for the individuals charged but also for their host countries, which have interests both in their own jurisdiction and in the freedom of their citizens who, under their laws, have often committed no crime. Such a serious and consequential step, if it is to be taken at all, must be taken by Congress, and must be taken by Congress

clearly; the decision is not left for courts to intuit on the basis of statutes that can plausibly be read either way.

Furthermore, the court's holding that the canon can be overcome by a statute's non-domestic focus runs contrary to *Sale*, and its attempt to distinguish the case is unconvincing. *See* Op. at 16–17. In *Sale*, the Supreme Court applied the canon to a provision of the Immigration and Nationality Act ("INA") in order to determine, as here, the applicability of that Act to aliens interdicted on the high seas. The case highlights the wide applicability of the canon, as well as how high the hurdle of "affirmative evidence" is. The provision at issue in *Sale* prohibited the "return" of refugees before giving them an asylum hearing, in part to implement the United Nations Convention Relating to Status of Refugees, which the United States has ratified. Implementation of a treaty defining the United States' obligations with respect to refugees is hardly a "domestic condition," notwithstanding this court's valiant attempt to frame it as such. *See* Op. at 16–17. Absent the canon against extraterritoriality, the "natural inference," Op. at 12, or "more natural reading," *Empagran*, 124 S.Ct. at 2372, would be that if the United States is forbidden by treaty from "return[ing]" refugees to their home country without a hearing, "contextual reasons" would suggest that the functionally equivalent step of intercepting them prior to landing and returning them to their home countries would equally violate the United States' obligations under the treaty and thus under the implementing statute. Notwithstanding this inference, the Supreme Court held that the relevant provision of the INA was inapplicable because Congress had not affirmatively extended its reach beyond United States borders. In *Sale*, the Court expressly stated that its holding did not depend, as this court suggests, *see* Op. at 17 n.2, on the fact that the INA referred to deportation proceedings and referenced the Attorney General, a domestic official. Rather, the Supreme Court stated that "[e]ven if [the provision respecting the return of refugees] were not limited to strictly domestic procedures, the presumption that Acts of Congress do not ordinarily apply outside our borders would

support an interpretation . . . as applying only within United States territory." 509 U.S. at 173.

*Sale* should put to rest the court's contention that the canon against extraterritoriality is satisfied by legislation touching upon non-domestic concerns. And as discussed, prudential factors favoring application of the canon to criminal provisions of the INA are at least as strong, if not stronger, than those for applying it to civil provisions.

The court's reliance on *United States v. Bowman*, 260 U.S. 94 (1922), to support its theory that a statute's non-domestic focus overcomes the presumption against extraterritoriality, is misplaced. *See* Op. at 12–15. The Supreme Court in *Bowman* dealt with the extraterritorial applicability to United States citizens of offenses against the United States government, noting that the government has a right to defend itself against such crimes "especially if committed by its own citizens, officers, or agents," *Bowman*, 260 U.S. at 98, whom the court ruled could be held to answer to the "crime against the government to which they owe allegiance." *Id.* at 102. *Bowman* left open whether, as here, such laws should be read as applying extraterritorially to foreign nationals without express Congressional authorization, as one of the co-defendants in *Bowman*, a British national, was not before the Court. *Id.* at 102–03. While this court writes off this distinction as "irrelevant," Op. at 13, the distinction substantially weakens the strength of the inference that can be drawn from "context." The prudential concerns behind the canon against extraterritoriality, in light of the Supreme Court's subsequent instruction, counsel against expanding the *Bowman* rationale to non-citizens. Even were nothing to prevent Congress from criminalizing acts by foreign nationals abroad, *Bowman* is instructive about which inferences are reasonable to draw, and it is reasonable to infer that Congress is more likely to assert jurisdiction over its own citizens abroad than over foreign nationals abroad, given the jurisdictional and foreign policy implications of such a step.

The different nature of the offenses at issue further undermines the analogy to *Bowman*. The rationale behind *Bow-*

*man* was that some crimes, such as defrauding the United States government, because they directly harm the United States government in a manner "not logically dependent on their locality," 260 U.S. at 98, are such that it is obvious that in declaring them to be crimes Congress intends to prohibit them everywhere. While this may be true of a class of crimes such as terrorism against American targets, *see United States v. Yousef*, 327 F.3d 56, 86 (2nd Cir. 2003), or the murder of United States agents abroad, *see United States v. Felix–Gutierrez*, 940 F.2d 1200, 1204–05 & n.3 (9th Cir. 1991), the offenses charged against Garcia and his two co-defendants under 8 U.S.C. § 1324 are of a different character. The harm that § 1324 prevents is the unauthorized entry of aliens into the United States, which is quite "logically dependent on [its] locality." *Bowman*, 260 U.S. at 98. Extraterritorial predicate acts occurring thousands of miles from the United States such as those charged here harm the United States only by a far more attenuated causal chain, by making it more likely that, at some point in the future, unauthorized aliens may attempt illegal entry into the United States.

In *Bowman* and cases like *Yousef* and *Felix–Gutierrez,* courts have departed from the presumption against extraterritoriality only because a crime (such as a terrorist attack or the murder of a United States agent) would harm the United States government even if it was completed abroad. Given the nature of the crime, the courts inferred that Congress must have intended to protect the United States government from harm irrespective of its origin. The less direct and the less immediate the harm to the United States from extraterritorial conduct is, the weaker this inference becomes, and the more likely it is that Congress would consider countervailing factors to outweigh any interest in extraterritorial application. Congress might adopt, on a legislative record more complete than the one now before the court, the court's conclusion that extraterritorial application of 8 U.S.C. § 1324 is required to safeguard United States borders more effectively. *See* Op. at 12. But the necessity of such an approach calls for a policy conclusion that is hardly so obvious that the court can attribute it to Congress solely on the basis of the offenses at issue

here, as it can where the harm is direct and immediate. The extraterritorial conduct of Garcia and his two codefendants ended in Guatemala over 2,500 miles from the United States and over 100 miles from Mexico, where the migrants intended to travel. Under the circumstances, there is not enough to warrant a departure from the "longstanding principle of American law" that statutes only apply domestically "unless a contrary intent appears." *Arabian American Oil Co.*, 499 U.S. at 248.

## II.

The requirement of "affirmative evidence" that the Supreme Court set forth in *Sale*, 509 U.S. at 176, rather than this court's looser "contextual reasons for reading the text otherwise" test, *see* Op. at 11, compels the conclusion that neither 8 U.S.C. § 1324(a)(1)(A)(i) nor (a)(1)(A)(iv) applies extraterritorially, nor, by extension, does the conspiracy offense in (a)(1)(A)(v). While the statute can be read to reach predicate acts in foreign countries that could eventually lead to the entry of undocumented aliens into the United States, it is equally plausible from the text of the statute and the policies behind it that Congress had a less ambitious enforcement scheme in mind. This latter possibility is confirmed by the history of the attempt provision in the illegal bringing offense, 8 U.S.C. § 1324(a)(1)(A)(i), which was meant to do no more than ensure that persons transporting unauthorized aliens to the United States would not be absolved from liability by an immigration official's refusal, upon arrival, to let the aliens enter. As to the encouragement/inducement offense, 8 U.S.C. § 1324(a)(1)(A)(iv), Congress has been silent as to extraterritoriality, and absent a clear statement from Congress or any jurisdictional limits, the purpose behind the canon against extraterritoriality counsels against reading the statute to have such breadth.

## A.

The plain text of § 1324 contains no affirmative statement that the acts it forbids are also forbidden when they occur in

other nations or on the high seas. This absence alone is meaningful, although not entirely fatal. The presumption against extraterritoriality, while strong, does not quite have the force of a clear statement rule; the Supreme Court in *Sale* consulted legislative history when the provision of the INA at issue contained no clear statement of Congress' desire to apply it outside the United States. *See Sale*, 509 U.S. at 174–77. It is instructive, however, that in the context of preventing the entry of illegal drugs into the United States, a subject that raises similar policy questions about the extent to which the United States wishes to protect its borders by preemptively extending its laws into the high seas or other countries, Congress has criminalized extraterritorial acts on the face of the relevant statute. *See* Maritime Drug Law Enforcement Act, Pub. L. No. 96–350 (1980) (codified as amended at 46 U.S.C. app. §§ 1901–04 (2004)) ("Maritime Drug Act"). The Maritime Drug Act is an example of what a statute looks like when Congress intends to apply it extraterritorially: it contains an express provision dictating that it "is intended to reach acts . . . committed outside the territorial jurisdiction of the United States," § 1903(h); it provides for the jurisdictional limit that it does not apply to foreign nationals on the vessels of foreign nations that do not consent to the enforcement of U.S. law, § 1903(a); and it provides jurisdiction and venue rules for defendants subsequently brought into the United States to stand trial, § 1903(f). By contrast, 8 U.S.C. § 1324 contains none of these elements. The court casts the Maritime Drug Act aside, speculating that Congress was addressing a less "outward-looking" statute than a border control statute, *see* Op. at 18–19, but this distinction is hardly persuasive. The "natural inference," *cf.* Op. at 12, of a statute specifically aimed at maritime drug interdiction would presumably be that it applies on the high seas, yet Congress still thought it necessary to specify that the statute has extraterritorial application. 49 U.S.C. app. § 1903(h).

Nor are the criminal offenses in 8 U.S.C. §§ 1324(a)(1)(A)(i) and (a)(1)(A)(iv) of such character as to cause a logical inference that they must take place abroad. The title of

§ 1324, "bringing in and harboring certain aliens," as well as the substantive offenses in (a)(1)(A)(i) ("bringing"), (a)(1)(A)(ii) ("transport[ing] . . . within the United States"), and (a)(1)(A)(iii) ("harbor[ing] or shield[ing] from protection") imply the opposite, as one generally cannot "bring[ ] in," "bring . . . to the United States," "transport . . . within the United States," or "harbor" aliens without also being in the United States oneself. The only substantive offense that it is possible to commit outside of the United States is the encouragement/inducement offense in (a)(1)(A)(iv). Yet it is equally possible to commit the same acts domestically, such as by advertising the availability of jobs for undocumented immigrants or by telephonically inviting foreign acquaintances illegally to join the inducer in the United States. While Congress could have wanted to criminalize both, the text of (a)(1)(A)(iv) does not dictate such a conclusion.

To overcome this difficulty, the court finds an implicit command of extraterritorial application in the inchoate offense of attempted bringing in (a)(1)(A)(i) ("attempt[ing] to bring to the United States"). The court offers three reasons for this reading, the first textual, the second intra-textual, the third rooted in policy; none is persuasive. The textual argument, which reasons that "attempts" usually occur abroad because they become completed crimes upon the aliens' entry into the United States, *see* Op. at 14–15, ignores the fact that attempts that fail at the border or in territorial waters have entered the territorial jurisdiction of the United States without completing the substantive crime. Aliens intercepted at the border or in territorial waters have not, for many legal purposes, entered the United States. The Supreme Court explained in *Sale*:

> Under the INA, both then and now, those seeking "admission" and trying to avoid "exclusion" were already within our territory (or at its border), but the law treated them as though they had never entered the United States at all; they were within United States territory but not "within the United States."

509 U.S. at 175. While the attempt provision in § 1324(a)(1)(A)(i) is open to the court's reading, it can just as plausibly refer to instances where an attempt to bring undocumented aliens into the United States fails because the aliens are intercepted at the border or in territorial waters (if the attempt involves surreptitious entry), or refused entry by immigration officials (if the attempt involves fraudulent entry). While the record does not contain any statistics about United States border control efforts, such interdiction at the border would seem to be the place where many attempts fail that subsequently become the basis for (a)(1)(A)(i) prosecutions. Because the plain text of (a)(1)(A)(i) is amenable to either reading, it is not "affirmative evidence" of extraterritorial application.

The court's second, intra-textual argument finds a command of extraterritorial application in the forfeiture provisions at 8 U.S.C. § 1324(b)(1), which authorize seizure of "any vessel . . . being used in the commission of a violation of subsection (a)." *See* Op. at 15–16. The court reasons that (b)(1) applies extraterritorially, and therefore (a) must as well, for otherwise the two subsections are not in harmony. *See* Op. at 16. But that reasoning is circular; by its plain terms, (b)(1) only applies to a vessel "being used in the commission of a violation of subsection (a)"; in other words, (b)(1) only applies extraterritorially if (a) does, and vice versa. Moreover, (b)(1) has a perfectly sensible meaning if (a)(1)(A)(i) applies only territorially: it authorizes seizure of vessels intercepted in territorial waters, vessels in port where immigration officials detect illegal entrants as they disembark, and, arguably, vessels intercepted on the high seas in connection to a conspiracy that extends into the United States. It is not surprising that the forfeiture provisions would be limited to property otherwise within United States jurisdiction. Section (b)(1) counsels against, not in favor of, extraterritorial application of (a)(1)(A)(i). The consequence to (b)(1) of reading (a)(1)(A)(i) extraterritorially highlights the dangers of disregarding the canon against extraterritoriality. Because this court's reading leaves the statute with no jurisdictional limits, it would authorize the seizure and forfeiture

of foreign property within or subject to the jurisdiction of other countries—such as, for instance, the seizure of a ship flying a foreign flag on the high seas, or even within the territorial waters of a foreign country. To say that this creates "conflict with the laws of other nations," *Sale*, 509 U.S. at 174, not to mention with international treaties to which the United States is a signatory, *see, e.g.*, Convention on the Law of the Sea, April 29, 1958, 13 U.S.T. 2312 (entered into force Sept. 30, 1963), would be an understatement.

The court's third, policy-based argument is that because "the terrorist attacks of September 11, 2001" remind us that "border-control policies are of crucial importance to [ ] national security and foreign policy," the 1903 Congress that enacted the provision must have intended it to reach extraterritorially in order to protect the United States' borders. Op. at 12. Congress could, of course, adopt the same policy conclusion and decide that criminalizing extraterritorial predicate acts (such as, in the instant case, covert travel to Guatemala) is a necessary component of border control. But an important purpose behind the presumption against extraterritoriality is that such decisions are to be made by Congress, and not the courts. The record before the court contains nothing to support the premise that territorial enforcement of the statute would be so inadequate that Congress could not have intended it; for example, there is no evidence on which to evaluate the relative effectiveness of different mechanisms of immigration enforcement, such as how heavily immigration authorities rely on interdiction in foreign countries rather than at the United States border, or on interdiction on the high seas vis-a-vis in territorial waters; nor is there any evidence on whether interdiction on the high seas subject to some other authority, without the threat of criminal sanctions, is significantly less effective than interdiction with that threat. The court's failure to cite even one case in which § 1324(a)(1)(A)(i) has been applied extraterritorially undercuts its apparent fear that border control will be undermined by failure to do so.

The unusual circumstances underlying the indictments at issue hardly suggest that extraterritorial enforcement of

§ 1324 plays an integral role in United States border control. The *Jose Alexander II* was not intercepted in United States waters, or close to such waters and or headed towards them, but was rather intercepted off the southern coast of Guatemala, over two thousand five hundred miles from the United States, en route from Ecuador to Guatemala. Nothing in the record suggests that the Coast Guard deems it necessary or even useful to patrol waters so distant from United States shores to detect alien smuggling. The United States vessel that spotted and intercepted the *Jose Alexander II* was not a Coast Guard vessel but a Navy destroyer, the *U.S.S. Fife*, that had a Coast Guard Law Enforcement Detachment on board. The Coast Guard's involvement was initially humanitarian, for purposes of providing food and water to the migrants and ensuring their safety in reaching shore in Guatemala. Only after the *Jose Alexander II* reached Guatemala did interviews with the passengers reveal circumstances that led to the criminal charges under § 1324.

Moreover, the court's attempt to read post-September-11th immigration policy into 8 U.S.C. § 1324 runs aground on the legislative history of the attempt provision in the illegal bringing offense. That history shows that Congress' addition of the attempt provision was meant to do nothing more than ensure that those involved in transporting illegal aliens to the United States would not be absolved from criminal liability because an immigration official ultimately denied the aliens entry into the country. The "bringing" offense, currently codified at § 1324(a)(1)(A)(i), originated in § 6 of the 1891 Immigration Act, Act of March 3, 1891, ch. 551, 26 Stat. 1084 (1891), which made it a misdemeanor to "bring into or land in the United States by vessel or otherwise, or [ ] aid to bring into the United States . . . any alien not lawfully entitled to enter." This 1891 provision, because it required completion of the offense, quite plainly did not apply extraterritorially. The attempt provision was inserted by the 1903 Immigration Act, Act of March 3, 1903 ch. 1012; Pub. L. No. 57–162; 32 Stat. 1213. The House Report to the 1903 Act explains that Congress amended the provision to:

> substitut[e] the word "attempt" for "aid," the courts having held that the word "aid" involved the actual landing of the prohibited alien. *Since such an alien is rejected*, the provision must be amended or remain, as it has been since the decision . . . [,] a dead letter.

H.R. REP. NO. 57–982 at 4 (1902) (emphasis added). In other words, Congress was responding to court decisions holding that persons who brought aliens not entitled to enter the United States could not be held liable under the initial wording of § 6 when those aliens were denied entry by immigration officials. *Id.* There is nothing to suggest that the 1903 substitution of the term "attempt" for "aid" was intended to expand the bringing offense extraterritorially; the amendment was only to ensure that the criminal provision would apply even when "*such an alien is rejected*," *id.*, i.e., when, upon reaching the United States, the alien is denied entry. When Congress enacted the Immigration and Nationality Act of 1952, ch. 477, Pub. L. No. 82–414 (1952), 66 Stat. 163, which consolidated existing immigration statutes and relocated the bringing offense to § 1324 of the United States Code, Congress described the 1903 amendment, which inserted the attempt provision, only as intended "primarily to codify existing law." H.R. REP. NO. 82–1365 at 14 (1952).

When § 6 of the 1903 Act was recodified, with minor changes, as § 8 of the 1917 Immigration Act, ch. 29, Pub. L. No. 64–301; 39 Stat. 874, to prohibit "any person, including the master, agent, owner, or consignee of any vessel" from "bring[ing] into or land[ing] in the United States, by vessel or otherwise, or [ ] attempt[ing], by himself or through another, to bring into or land in the United States" any undocumented alien, nothing indicates that Congress intended to expand the scope of the original 1891 law or the 1903 amendment. Further, in 1933, when the United States prosecuted an alien smuggler intercepted on the high seas on the theory that he had attempted to bring unlawful aliens into the United States, the Ninth Circuit, in *Yenkichi Ito v. United States*, 64 F.2d 73 (9th Cir. 1933), held that § 8 did not apply extraterritorially and dismissed the indictment. Not surprisingly, Congress nowhere tried to correct or express disagreement with the

14

*Yenkichi Ito* decision, which comported with Congress' expressed intent in enacting the 1903 amendment.

The Supreme Court explained in *Johnson v. Transp. Agency of Santa Clara Cty.*, 480 U.S. 616, 629 n.7 (1987), that although Congressional "inaction" in the face of a judicial construction of a statute "may not always provide crystalline revelation," that "should not obscure the fact that it may be probative to varying degrees." By virtue of the Ninth Circuit's geography, *Yenkichi Ito* has been the law in every state and territory having contact with the Pacific Ocean for over seventy years. If Congress had thought it necessary that the attempted bringing offense apply extraterritorially so as to make it possible to intercept alien smugglers on the high seas, it would, particularly if it had shared this court's fear, have corrected a decision that removed one of two neighboring oceans from the statute's reach. While the court observes that other circuits, in cases such as *Claramont v. United States*, 26 F.2d 797 (5th Cir. 1928) (per curiam), have upheld the extraterritorial application of the encouragement/inducement offense, *see* Op. at 20, the inducement offense, unlike the attempted bringing offense, bears no obvious nexus to the high seas or maritime interdiction. *Yenkichi Ito* is the only case to decide whether the attempted bringing offense under (a)(1)(A)(i) applies extraterritorially, and its interpretation has been binding over a very large geographic area for a very long time and never changed by Congress.

Congress has not acted to correct the interpretation in *Yenkichi Ito*, moreover, despite being informed by the Justice Department that it considered itself bound not to prosecute the attempted bringing offense extraterritorially. When Congress revised § 1324(a) in the Immigration Reform and Control Act of 1986, Pub. L. No. 99–603, 100 Stat. 3381, the Justice Department urged Congress to retain the encouragement/inducement offense, which the Department claimed had "proven to be a useful tool in combatting [sic] alien smuggling" and "the only provision . . . that has extra-territorial application." *See* H.R. REP. No. 99–682, pt. 1, at 112 (1986). The Department thus put Congress on notice that the Department would not prosecute the attempted bringing offense

outside of the United States. Despite amending (a)(1)(A)(i) to correct other court decisions not at issue here, Congress took no action with respect to (a)(1)(A)(i)'s extraterritorial application. Congress' silence on extraterritorial application of § 1324(a)(1)(A)(i), when confronted with both the *Yenkichi Ito* decision and the Justice Department's 1986 representation, is deafening.

There are, admittedly, fewer indications of Congressional intent with respect to the encouragement/inducement offense in 8 U.S.C. § 1324(a)(1)(A)(iv), which, on its face, is consistent with or without a territorial limitation. The offense originated in §§ 5–7 of the 1917 Immigration Act, which contemplated that some prohibited encouragements such as "advertisements printed, published, or distributed in any foreign country," § 6, would occur abroad. It is unclear from the face of the 1917 statute or the contemporaneous legislative history, however, whether such extraterritorial acts would also trigger liability for a foreign national who never set foot in, or accompanied any unlawful aliens into, the United States. The prohibitions on "solicit[ing] the importation or migration of any day laborer" in § 5, and "soliciting or attempting to induce, assist, encourage, or solicit any alien to come into the United States by promise of employment" in § 6 both imply that Congress' concern was primarily with domestic employers. The civil penalties in § 7 of the Act that related to those "engaged in the business of transporting aliens to or within the United States" became operative only upon a determination that the defendant "ha[d] brought or caused to be brought to a port of the United States any alien so solicited," *id.* § 7, although the criminal penalties under § 7 are the same as those for employers under § 5 and are similarly silent as to when liability is triggered. Again, the 1952 Immigration and Nationality Act, which consolidated these offenses into the generic encouragement/inducement offense currently codified at § 1324(a)(1)(A)(iv), provides no indication that the simplification and consolidation was intended to effect a significant change in their operation.

Nothing about an encouragement/inducement provision with a territorial limitation would be illogical. Most such

acts, as the court acknowledges, *see* Op. at 16, presumably occur abroad, but that cuts against, not in favor of, extraterritorial application: there are likely few migrants who are not encouraged or induced by some third party to make the journey to the United States before they emigrate from a foreign country. Congress could have reasonably concluded that inducements by persons already in the United States, such as employers promising jobs (as, historically, was the principal concern in 1917), or residents urging friends and family members to join them here, pose a greater threat than encouragement by foreign nationals abroad, because the former are more likely to provide specific destinations and credible promises of support and concealment upon arrival. Or Congress could have concluded, as it did in the Maritime Drug Act, 46 U.S.C. app. § 1903(a), that jurisdictional and foreign policy concerns weigh against criminalizing activity by foreign nationals in foreign jurisdictions, particularly, as here, where the crime can consist of mere speech and is likely exceedingly common.

The combination of a statutory text that permits but does not require extraterritorial application and a silent legislative history is not enough of a basis for a court to decide to apply the encouragement/inducement offense in § 1324(a)(1)(A)(iv) beyond the territorial jurisdiction of the United States. Courts "assume that Congress legislates against the backdrop of the presumption against extraterritoriality." *Arabian American Oil Co.*, 499 U.S. at 248. As the Supreme Court instructed in *Sale*, in refusing to consider a particular amendment to the Immigration and Nationality Act sufficient evidence of Congress' intent to extend the law extraterritorially, the possibility that Congress "might have intended" such a result "is not a substitute for the affirmative evidence of intended extraterritoriality that our cases require." 509 U.S. at 176. *See also Empagran*, 124 S.Ct. at 2366; *Arabian American Oil Co.*, 499 U.S. at 250.

**B.**

By departing from well-established Supreme Court precedent against reading statutes to apply extraterritorially ab-

sent "affirmative evidence," the court's holding on 8 U.S.C. § 1324 stands alone. Other circuit courts of appeal have upheld convictions for extraterritorial encouragement and inducement where the alien ultimately entered the United States, *see United States v. Nunez*, 668 F.2d 10, 12–13 (1st Cir. 1981) (per curiam); *United States v. Castillo–Felix*, 539 F.2d 9, 12–13 (9th Cir. 1976); *United States v. Williams*, 464 F.2d 599, 601 (2nd Cir. 1972), and in dictum observed the extraterritorial application of the attempted bringing offense where a vessel is intercepted in United States waters. *See United States v. Liang*, 224 F.3d 1057, 1060 (9th Cir. 2000). Likewise in *Claramont*, 26 F.2d 797, relied on by the court, *see* Op. at 20, the alien who was induced actually entered the United States. *See Emmanuel v. United States*, 24 F.2d 905 (5th Cir. 1928); *Smith v. United States*, 24 F.2d 907 (5th Cir. 1928). But no other circuit court has previously upheld an indictment under the encouragement/inducement charge, § 1324(a)(1)(A)(iv), where, as here, the inducement takes place abroad and the alien never reaches the United States, or under the attempted bringing charge, § 1324(a)(1)(A)(i), where, as here, no aspect of the attempt ever reaches the United States. There are no cases on point from other circuit courts of appeal regarding the encouragement/inducement offense, and the only case on point regarding the attempted bringing offense, *Yenkichi Ito*, 64 F.2d 73, rejects the court's interpretation.

The breadth that the court reads into 8 U.S.C. § 1324 should not be understated. While the conduct at issue in this particular case occurred on the high seas, nothing in the statute, once untethered from any territorial limit, confines it to maritime interdiction. Presumably, the guide who covertly helps migrants from Ecuador into Colombia (so that they can eventually reach the United States) could be guilty of conspiracy to violate § 1324(a)(1)(A)(i); the Ecuadorian mother who convinces her son to make the illegal voyage to the United States so that he can send back money to support the family living abroad could be guilty of violating § 1324(a)(1)(A)(iv). The point is not that Congress could not, subject to the limitations of the Fifth Amendment, *see United States v.*

*Davis*, 905 F.2d 245 (9th Cir. 1990), criminalize such conduct (or that the United States would care to enforce the statute against minor participants), but rather that absent a territorial stopping point, the breadth of the statute becomes staggering. The court's confidence that prosecutorial discretion and diplomatic skill will smooth over such difficulties, *see* Op. at 21, is not particularly reassuring or relevant: if the Supreme Court thought Executive Branch expertise were the solution to problems arising from the unintentional application of United States law abroad, there would be little need for a canon against extraterritoriality.

Indeed, the lack of jurisdictional limits in 8 U.S.C. § 1324 should be a warning that Congress did not contemplate extraterritorial application. As noted, Congress' approach to preempting the importation of illegal drugs in the Maritime Drug Act, 46 U.S.C. app. §§ 1901–04 (the law the *U.S.S. Fife* was likely enforcing when it happened upon the defendants' vessel), is instructive. In that Act, Congress expressly extended its reach to vessels on the high seas, but limited it to vessels subject to the jurisdiction of the United States, stateless vessels, vessels of consenting nations, and United States citizens and resident aliens on board any vessel. *Id.* § 1903(a); *cf. United States v. Gonzalez*, 311 F.3d 440 (1st Cir. 2002). Congress thus drew a line, based on its judgments about foreign relations and international law, that it would not criminalize acts by foreign nationals on the vessels of foreign nations without such nations' consent. This is precisely what the presumption against extraterritorial application serves to ensure: that Congress consider such factors and draw such lines, and that the judiciary, lacking foreign policy expertise, respect these considerations by erring against finding extraterritorial application in unclear statutes. The Supreme Court's decision this Term in *Empagran*, 124 S. Ct. at 2366, could not be clearer on this point.

In sum, the court's interpretation, which criminalizes acts irrespective of location, jurisdiction, or the nationality of the defendant, absent any indication that Congress gave such factors consideration, fails to heed the prudential interests the canon safeguards. Both through the substantive offenses

and inchoate crimes, application of 8 U.S.C. § 1324 extraterritorially criminalizes a wide range of conduct that is legal in the countries in which it occurs, including a great deal of travel and speech. The court's holding allows 8 U.S.C. § 1324, where Congress was silent about extraterritoriality, to reach, paradoxically, much further into the jurisdiction of other countries than the closely analogous Maritime Drug Act, in which Congress expressly proclaimed its intention to apply the statute abroad. It is unlikely that Congress ever intended such a dichotomous outcome, and "context" alone cannot provide the requisite indication of Congressional intent as required by the Supreme Court. Because Congress has not "clearly expressed" that the offenses charged in the indictment under 8 U.S.C. § 1324 are to apply extraterritorially, *Arabian American Oil Co.*, 499 U.S. at 248 and the government fails to offer evidence to overcome the presumption against extraterritoriality of statutes, and because the government has waived any waiver claim it might have against the statutory challenge, *see* concurring opinion of Judge Randolph, the indictments should have been dismissed. Accordingly, I respectfully dissent.